INTERSTELLAR STARSHIP SER-
VICES, LIMITED, Plaintiff-coun-
ter-defendant-Appellee,

Michael R. TCHOU, Counter–
claimant–Appellee,

and

United States of America, Intervenor,

v.

EPIX, INCORPORATED, an Illinois
corporation, Defendant-counter-
claimant Appellant.

No. 01–35155.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 2002.

Filed Sept. 20, 2002.

Sheldon L. Epstein, Law Office of S.L. Epstein, Wilmette, IL, for the defendant-counter-claimant-appellant.

Peter E. Heuser, Kolisch, Hartwell, Dickinson, McCormack & Heuser, Portland, OR, for the defendant-counter-claimant-appellant.

Lainie F. Block, Portland, OR, for the defendant-counter-claimant-appellant.

Michael M. Ratoza and Laura Caldera Taylor, Ratoza Long, P.C., Portland, OR, for the plaintiff-counter-defendant-appellee and counter-claimant-appellee.

Before: TROTT, T.G. NELSON, Circuit Judges, and SHADUR,* District Judge.

TROTT, Circuit Judge.

Epix, Inc. ("Epix") sued Interstellar Starship Services ("ISS") and its president Michael Tchou ("Tchou") in district court alleging that their use of the *www.epix.com* domain name infringed Epix's registered EPIX trademark. The district court enjoined ISS and Tchou from future infringing uses of *www.epix.com* but allowed ISS to retain ownership of the domain name. Epix appeals, contesting the district court's failure to find that: (1) ISS's use of epix.com caused initial interest confusion; (2) ISS cybersquatted on epix.com; and (3) ISS diluted the EPIX trademark. Epix appeals also the scope of the injunction imposed by the district court. In the main, Epix argues that the epix.com domain name should be transferred from ISS to Epix or that the injunc-

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

tion should be broadened to include ISS's future successors and assigns of *www.epix.com.* We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the district court's decision in all respects.

## BACKGROUND

Epix manufactures and sells a wide variety of electronic imaging hardware and software products and provides consulting services associated with these products. Epix markets its products to sophisticated consumers, mainly universities, research laboratories, and photography enthusiasts. It advertises in a variety of trade magazines and sells its products through distributors and on the Internet at *www.epix-inc.com.* Its products retail for $395 to $2000.

Epix first used the trademark EPIX in 1984, and registered that mark in 1990 with the Patent and Trademark Office ("PTO") for use with "printed circuit boards and computer programs for image acquisition, processing, display, and transmission." The EPIX trademark acquired incontestable status in December 1996.[1] Epix registered its EPIX mark with the State of Oregon on June 17, 1997.

Tchou is an electrical engineer, with a background in electronic imaging, who has worked for Lattice Corporation and more recently, Intel. Tchou is also the sole founder, officer, director, shareholder and employee of ISS. In 1995, as president of ISS, Tchou registered the domain name *www.epix.com* with Network Solutions.[2] Tchou testified that he registered the domain name epix.com because the catchy name connoted electronic ("e") pictures ("pix").[3]

We have remarked before that "[t]he record does not make crystal clear the precise nature of ISS's business or its use of the 'epix.com' webpage." *Interstellar Starship Serv. v. Epix, Inc.,* 184 F.3d 1107, 1109 (9th Cir.1999) (*Interstellar I* ). As the district court once described: "The site has some characteristics of a serious business venture and some characteristics of a personal scrapbook." *Interstellar Starship Servs. v. Epix, Inc.,* 125 F.Supp.2d 1269, 1274 (D.Or.2001). Tchou testified at trial that he hopes to develop the epix.com website into a multimillion dollar Internet portal, like Yahoo, featuring a variety of electronic pictures.

Since its launch, however, ISS's website has not grown to epic proportions. Instead, it has been used mainly to promote the Clinton Street Cabaret, a Portland theater troupe that performs *The Rocky Horror Picture Show.* The website contains numerous digital pictures of the actors and the playhouse, as well as information related to the performance and history of *Rocky Horror.* Several webpages display identification badges that ISS made for members of the Clinton Street Cabaret

---

**1.** After five years of continuous use in commerce, a registered mark may become statutorily "incontestable." 15 U.S.C. § 1065.

**2.** Network Solutions, Inc. is a domain name registrar. After registration, Network Solutions enters the domain name and the corresponding Internet Protocol address in its database, thereby permitting automatic translation when an Internet user enters that domain name. *See Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 981–82 (9th Cir.1999).

**3.** There are about 110,000 registered domain names with the "e" prefix, which stands for 'electronic' and is synonymous with 'online' or 'high tech.' Xuan–Thao N. Nguyen, *Shifting the Paradigm in E–Commerce: Move Over Inherently Distinctive Trademarks–The E–Brand, I–Brand and Generic Domain Names Ascending to Power?* 50 Am. U.L.Rev. 937, 954, 954 n. 113 (2001) [hereinafter Nguyen, *Shifting the Paradigm* ].

and a splinter acting group, Sibling Rivalry. A question and answer page provides peculiar information touting Tchou's badge-making abilities.

Initially, the website included uncommonly detailed information about how Tchou transferred the digital pictures onto the Internet and how he touched them up before posting. This information suggested that Tchou prepared the photographs using "proprietary epix.com pixel manipulation (bitt-widdling) tools." In addition, a beta version of the website allegedly hyperlinked to a webpage containing autobiographical information about Tchou. That page purportedly bally-hooed Tchou's technical experience with computer hardware, software, and graphics and also permitted visitors to read about ISS and its consulting services.

The present dispute first erupted when Epix unsuccessfully attempted to register the *www.epix.com* domain name that ISS was already using. Epix demanded that Network Solutions cancel ISS's epix.com registration. When informed by Network Solutions of Epix's demand, ISS filed for a declaratory judgment of non-infringement. Epix counterclaimed, alleging federal unfair competition and trademark infringement, as well as Oregon trademark infringement and dilution. Once Epix counterclaimed, or at some point thereabouts, ISS stripped its site of everything except the Clinton Street Cabaret information.

In the first go-round of this contest, the district court granted summary judgment in favor of ISS, finding no likelihood of confusion between ISS's use of epix.com to support the Clinton Street Cabaret and Epix's business use of the mark EPIX. *Interstellar Starship Servs. v. Epix Inc.,* 983 F.Supp. 1331, 1336–37 (D.Or.1997). Epix appealed. We held that although the district court "undertook a well-reasoned analysis of the appropriate law," there remained contested issues of material fact concerning whether ISS and Tchou infringed Epix's registration of the EPIX mark by using the epix.com website. *Interstellar I,* 184 F.3d at 1111.

On remand, Epix amended its complaint to include a claim of cyber-squatting pursuant to the newly enacted Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (1999). A bench trial ensued, wherein the district court resolved numerous contested factual matters. In the end, the district court held that ISS's *past* use of epix.com to promote Tchou's digital image processing software and computer consulting services *did* infringe Epix's trademark. The district court determined, however, that ISS's *present* use of epix.com to display electronic pictures and other information related to *The Rocky Horror Picture Show did not* infringe Epix's trademark. The district court found no cybersquatting violation under the ACPA and no trademark dilution under Oregon law. To remedy ISS's past infringement, the district court enjoined ISS from further infringing uses of the EPIX mark, including promotion of Tchou's technical services and digital image processing, the use of gray wallpaper, and the use of the EPIX.COM logo without an appropriate annotation disclaiming any affiliation with Epix. Nevertheless, the district court allowed ISS to retain ownership of epix.com.

Epix appeals the district court's refusal to transfer to it the epix.com domain name after finding past infringement by ISS. Epix appeals also the district court's determinations that ISS's use of epix.com did not result in initial interest confusion, that ISS did not cybersquat on epix.com, and that ISS did not dilute the EPIX mark. Finally, Epix prays that we broaden the district court's injunction to encompass

ISS's successors and assigns of the epix.com domain name.

## STANDARD OF REVIEW

■ We review for clear error the district court's legal and factual determination of likelihood of confusion under the trademark laws. *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The district court's injunctive relief is reviewed for an abuse of discretion. *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir.1999). The grant of a permanent injunction will be reversed only when the district court based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *GoTo.Com*, 202 F.3d at 1204.

## DISCUSSION

## I INITIAL INTEREST CONFUSION

■ The core element of trademark infringement is whether the similarity of the marks is likely to confuse customers about the source of the products. In this case, Epix argues that ISS's and Tchou's use of epix.com causes a likelihood of initial interest confusion among consumers. *See Brookfield*, 174 F.3d at 1062 (applying initial interest confusion to a domain name case); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir.1987) (recognizing the possibility of initial interest confusion). Initial interest confusion occurs when the defendant uses the plaintiff's trademark "in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion.'" *Brookfield*, 174 F.3d at 1062 (quoting *Dr. Seuss Enters. v. Penguin Books*, 109 F.3d 1394, 1405 (9th Cir.1997)); *see also Interstellar I*, 184 F.3d at 1110 ("We recognize a brand of confusion called 'initial interest' confusion, which permits a finding of a likelihood of confusion although the consumer quickly becomes aware of the source's actual identity and no purchase is made as a result of the confusion."). This Court has explained initial interest confusion using the following example:

> [Initial interest confusion] is much like posting a sign with another's trademark in front of one's store. Suppose [Blockbuster Video] puts up a billboard on a highway reading—"West Coast Video: 2 miles ahead at Exit 7"—where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast. Nevertheless, the fact that there is only initial consumer confusion does not alter the fact that Blockbuster would be misappropriating West Coast's acquired goodwill.

*Brookfield,* 174 F.3d at 1064.[4]

Epix contends that ISS's use of www.epix.com initially confuses consumers who expect to find Epix at that web address. In the end, however, this dispute arises because while many brick and mortar companies can peacefully coexist using the EPIX mark, there can be only one owner and user of *www.epix.com.*[5]

■ To evaluate the likelihood of confusion, including initial interest confusion, the so-called *Sleekcraft* factors provide non-exhaustive guidance. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 346 (9th Cir.1979); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 297 (3d Cir.2001) (applying similar factors to initial interest confusion). Those factors are: (1) the similarity of the marks; (2) the relatedness or proximity of the two companies' products or services; (3) the strength of the registered mark; (4) the marketing channels used; (5) the degree of care likely to be exercised by the purchaser in selecting goods; (6) the accused infringers' intent in selecting its mark; (7) evidence of actual confusion; and (8) the likelihood of expansion in product lines. *Sleekcraft,* 599 F.2d at 346. This eight factor test is pliant, and the relative import of each factor is case specific. *Brookfield,* 174 F.3d at 1054.

■ We have held that "in the context of the Web," the three most important *Sleekcraft* factors in evaluating a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the parties' simultaneous use of the Web as a marketing channel. *GoTo.Com,* 202 F.3d at 1205. When this "controlling troika," *id.* at 1205, or internet trinity, "suggests confusion is ... likely," *id.* at 1207, the other factors must "weigh strongly" against a likelihood of confusion to avoid the finding of infringement. *Brookfield,* 174 F.3d at 1058. If the internet trinity does not clearly indicate a likelihood of consumer confusion, a district court can conclude the infringement analysis only by balancing all the *Sleekcraft* factors within the unique context of each case.

Epix contends the district court erred as a matter of law in evaluating its claim of initial interest confusion. It argues that the district court erroneously considered all of the *Sleekcraft* factors, rather than just the internet trinity. We disagree.

To the district court's credit, it waded through volumes of evidence and around acrimonious litigants. In making its findings of fact, the district court fastidiously evaluated complex and conflicting testimony. Analyzing the internet trinity, the district court found that the parties' marks (EPIX and epix.com, respectively) were indistinguishable. As for the relatedness of the products, the district court determined that ISS's primary purpose—the promotion of the Clinton Street Cabaret—

4. The Second Circuit has described initial interest confusion as follows: A likelihood of confusion arises "not in the fact that a third party would do business with Pegasus Petroleum believing it related to Mobil [and its winged horse trademark], but rather in the likelihood that Pegasus Petroleum would gain crucial credibility during the initial phases of a deal. For example, an oil trader might listen to a cold phone call from Pegasus Petroleum—an admittedly oft used procedure in the oil business—when otherwise he might not, because of the possibility that Pegasus Petroleum is related to Mobil." *Mobil Oil,* 818 F.2d at 259.

5. The epix.com domain name is likely quite valuable. The price tags on other well-recognized domain names are astounding. Reports indicate that sex.com retailed for $250 million, business.com for $7.5 million, broadband.com for $6 million, loans.com for $3 million, and flu.com for $1.4 million. *See* Nguyen, *Shifting the Paradigm,* at 954.

did not compete with Epix's electronic imaging products, although ISS's incidental purpose—digital image processing and computer-related services—appeared, "at least superficially," the same as services offered by Epix. Finally, the district court determined that both parties maintained an Internet presence, but marketed to a different consumer base. This examination of the "controlling troika" did not clearly indicate that consumer confusion was likely. Thus, the district court appropriately concluded the analysis by balancing all the remaining *Sleekcraft* factors within the unique context of this case.

Considering the remaining *Sleekcraft* factors, the district court determined that Epix's trademark was relatively weak,[6] and that Epix's customers exercised a high degree of care purchasing expensive electronic imaging equipment. Weighing the conflicting evidence, the district court questioned Tchou's veracity, but in the end, found that Tchou adopted epix.com in good faith without knowledge of Epix's mark. Finally, the district court found no evidence of actual confusion and no likelihood that either company would "bridge the gap" to the other company's products or services. The district court did not err in employing this comprehensive likelihood of confusion analysis, and its factual findings were not clearly erroneous.

What Epix really wants from us, it seems, is a holding that, as a matter of law, *any* use of epix.com by ISS creates initial interest confusion with the EPIX mark and that Epix is therefore entitled to ownership of *www.epix.com*. Contrary to Epix's contentions and, as a matter of law, all uses of www.epix.com do *not* generate initial interest confusion with the EPIX mark. In a similar case, the First Circuit rejected Epix's basic contention. It held that use of the domain name *www.clue.com* for computer services did not infringe Hasbro's trademark on the board game Clue. *Hasbro Inc. v. Clue Computing, Inc.,* 232 F.3d 1, 2 (1st Cir.2000). The *Clue* court found no initial interest confusion because the companies' products were disparate, and there was no evidence of actual confusion. *Id.*

A series of examples further demonstrate why every use of epix.com does not infringe Epix's trademark EPIX for electronic imaging equipment.

If an apple grower adopts a famous trademark, like *www.DRSEUSS.com,*[7] as a domain name, initial interest confusion probably results, even if that business's goods differ significantly from those of Dr. Seuss. Marks of renown, like DR. SEUSS, describe the source of only one

---

**6.** According to the classic test originally formulated by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976), trademarks may be measured on a distinctiveness scale. "Fanciful" trademarks are nondictionary words (e.g. EXXON or KODAK); "arbitrary" trademarks are common words used in uncommon or unexpected ways (e.g. AMAZON for an on-line bookstore); "suggestive" trademarks require imagination, thought, or perception to link the trademark with the goods (e.g. ROACH MOTEL for insect traps); and "descriptive" trademarks merely describe the goods (e.g. YELLOW PAGES). "Generic" marks refer to the "genus of which the particular product is a species." *Id.* at 9. In general, fanciful, arbitrary, and suggestive marks receive automatic protection because of their inherent distinctiveness, whereas descriptive marks are protected only upon proof of distinctiveness acquired in commerce. Generic marks are not entitled to protection. *TCPIP Holding Co. v. Haar Communications, Inc.,* 244 F.3d 88, 93 (2d Cir. 2001) ("Generic marks are ... totally lacking in distinctive quality [and] are not entitled to any protection....").

**7.** No website currently resides at *www.DRSEUSS.com* although that domain name is not available for purchase according to www.register.com.

company's products, and the apple grower's adoption of the www.DRSEUSS.com domain name inevitably trades on the favorable cachet associated with that company, its works, and its reputation. Actionable initial interest confusion probably results even if every consumer realizes that DRSEUSS.com is owned by an apple grower, and no consumer ever consummates a Winesap, Delicious, or Granny Smith purchase thinking that Dr. Seuss grows apples or endorses, sponsors, or licenses his name to the apple grower.

In some circumstances, however, the apple grower might adopt a famous trademark without causing initial interest confusion. For example, an apple grower in Washington might register *www.apple.com* to promote his business. Although APPLE is a famous registered trademark of Apple Computer, Inc., many other companies also use the term APPLE to describe a variety of products.[8] Indeed, the apple distributor probably does not infringe Apple Computer's mark because APPLE is also a common noun, used by many companies, and the goods offered by these two companies differ significantly. *See Hasbro*, 232 F.3d at 2 (noting very little similarity between Hasbro's board game CLUE and the products and services of Clue Computing); *Brookfield*, 174 F.3d at 1056 (suggesting Schlumberger Ltd (a large oil drilling company) might advertise at *www.moviebuff.com* without infringing the MOVIEBUFF trademark on movie database software because Schlumberger's oil products differ greatly from software).

If, however, the apple grower adopted the *www.apple.com* domain name, and then competed directly with Apple Computer by selling computers, initial interest confusion probably would result. *See Brookfield*, 174 F.3d at 1056 (finding a likelihood of confusion where a company adopted a competitor's trademark as a domain name and offered similar goods under that name). In that circumstance, the apple grower would have acted in a way which traded on the goodwill of Apple Computer's trademark while preventing Apple Computer from using the APPLE trademark itself. This conduct would be actionable because confusion would inevitably result from the apple grower's actions. For example, a consumer might read about the apple grower's computers on *www.apple.com*, where she expected to find computers sold by Apple Computer, and decide to buy one, thereby permitting the apple grower to capitalize on the goodwill of Apple Computer's APPLE trademark— even if the consumer is never confused about the apple grower's lack of connection with Apple Computer. *See Interstellar I*, 184 F.3d at 1111 (defining initial interest confusion in these terms).

The different legal outcomes envisioned by these examples are predicted by the *Sleekcraft* factors. Consumers expect that owners of famous, fanciful trademarks will own the corresponding domain name, like *www.XEROX.com* or *www.KODAK.com.*, for no other companies identify themselves or their products using those marks. Indeed, confusion would abound if anyone other than Xerox owned *www.xerox.com.* Consumers, however, would not be shocked to find an apple grower at *www.apple.com* (although Apple Computer actually owns that domain name), or United Van Lines at www.united.com (although United Airlines happens to own that do-

---

8. The PTO website reports 679 active trademark registrations which include the work APPLE in some capacity. Representative examples include APPLEBEE on landscaping, APPLE TREE on wrapping paper, and MR. APPLE on horticultural products. *See* http://tess.uspto.gov/bin/gate.exe?f=searchss & state=mo5u88.1.1.

main name).[9] Although a consumer might incorrectly guess that United Van Lines would be found at www.united.com, *see Brookfield* 174 F.3d at 1044–45 ("Web users often assume as a rule of thumb that the domain name of a particular company will be company name followed by ".com." "), such an erroneous guess does not generally amount to a likelihood of initial interest confusion.[10]

As the examples demonstrate, actionable initial interest confusion on the Internet is determined, in large part, by the relatedness of the goods offered and the level of care exercised by the consumer. *See Checkpoint Sys.*, 269 F.3d at 296–97 ("Product relatedness and level of care exercised by consumers are relevant factors in determining initial interest confusion."). If a rogue company adopts as its domain name a protected trademark and proceeds to sell goods similar to those offered by the trademark owner, it necessarily free rides on the trademark owner's goodwill, and that rogue company benefits from increasing initial interest confusion as consumers exercise lower levels of care in making their purchasing decisions. Of course, the remainder of the *Sleekcraft* factors complete the case-by-case inquiry necessary to evaluate initial interest confusion on the Internet.

Applying these principles to our case, we find that it most resembles the example of the apple grower registering *www.apple.com* to sell apples. Like Apple Computer (or Hasbro), Epix has no exclusive claim to its trademark. Indeed, the record reflects that at least eight companies have registered the EPIX mark or a close variation with the PTO, and use the term in connection with on a variety of goods, including men's and women's clothing and medical imaging agents. On the Internet, the use of the EPIX mark is even more wide-spread. In addition to the brick and mortar companies using the EPIX mark in cyberspace, an Internet service provider, the Eastern Pennsylvania Internet Exchange and a Canadian emergency preparedness information exchange use EPIX to describe themselves. EPIX is also the word used in common Internet parlance to denote electronic pictures. Tchou has even suggested that EPIX is used so often on the Internet to describe electronic pictures that it may have become a generic term. *See Abercrombie & Fitch*, 537 F.2d at 9 (describing how a trademark might shift classifications).

Furthermore, ISS's "products"—the Clinton Street Cabaret and *The Rocky Horror Picture Show*—are extraordinarily different from Epix's digital imaging products. As is obvious by comparing

9. In fact, an apple distributor owns a website at *www.apples.com* and United Van Lines operates its site from *www.unitedvanlines.com*.

10. We note that much has been written about the role and reliability of search engines in the context of Internet trademark infringement and initial interest confusion. In the recent past, "[w]hen a keyword [wa]s entered, the search engine processe[d] it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword." *Brookfield*, 174 F.3d at 1045. Each search engine used its own algorithm, based on the domain name, website text, and the metatags, to arrange the results in a pro-

prietary sequence. *Id.* Now, those search engine algorithms incorporate corporate dollars into their formulae. Firms can pay the search engines in return for primary placement among the search results. For example, enter "whitehouse" as the keyword at: *www.overture.com.* and note the dollar amount entered beside each search result.

Accordingly, we find largely irrelevant what results when a given term is input into a search engine. Our initial interest confusion analysis does not depend on a given business's payment or lack thereof to the various search engines.

Epix's and ISS's websites, electronic imaging equipment is not *The Rocky Horror Picture Show*, and there is no immediate connection between the products. Upon arriving at ISS's epix.com website, the consumer would not think that Epix licensed, sponsored, or owned the ISS website. *Brookfield*, 174 F.3d at 1057. She would simply come to the inevitable and correct conclusion that more than one company uses the EPIX name and that Epix operates its website at a different address. Indeed, any consumer looking for Epix, who mistakenly guessed that it could be found at *www.epix.com*, would realize in one hot second that she was in the wrong place and either guess again or resort to a search engine to locate the Epix site at *www.epixinc.com*.

We note that although the misdirected consumer might enjoy ISS's digital photography momentarily, ISS could not financially capitalize on that misdirected consumer even if it so desired. Overall, the ISS website had little to do with commerce. The website contained no contact information for ISS or Tchou, and it was otherwise unable to interface with users. Indeed, Epix adduced no evidence that ISS or Tchou ever sold any product or service through its website. Under these circumstances, we discern no likelihood of consumer initial interest confusion.

The district court's additional findings of fact round out the *Sleekcraft* analysis and confirm our conclusion. Epix's mark was weak, even in the field of digital imaging equipment. Moreover, Tchou adopted the name epix.com in good faith because it connoted electronic pictures and no evidence indicated that he sought to trade on the goodwill of Epix or that either company intended to bridge the gap into the other's product line. These findings were not clearly erroneous and they support our conclusion that there was no likelihood of confusion in this case.

## II CYBERSQUATTING

Cybersquatting is the Internet version of a land grab. Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name. *See Virtual Works, Inc. v. Volkswagen of America Inc.*, 238 F.3d 264, 267 (4th Cir.2001). Congress enacted the ACPA because cybersquatting "threatened 'the continued growth and vitality of the Internet as a platform' for 'communication, electronic commerce, education, entertainment, and countless yet-to-be-determined uses.'" *Id.* (quoting S.Rep. No. 106–140, at 8 (1999)).

A cybersquatter is liable under the ACPA to the owner of a protected mark if the cybersquatter has:

(i) a *bad faith intent* to profit from that mark; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of mark that is distinctive ..., is identical or confusingly similar to that mark that is distinctive.

(II) in the case of a famous mark ..., is identical or confusingly similar to or dilutive of that mark.

*See* 15 U.S.C. § 1125(d)(1)(A) (emphasis added). A finding of "bad faith" is an essential prerequisite to finding an ACPA violation. Congress enumerated a list of nine factors to consider "in determining whether a person has a bad faith intent." *Id.* Congress did not mean these factors to be an exclusive list; instead, "the most important grounds for finding bad faith are 'the unique circumstances of the case, which do not fit neatly into the specific

factors enumerated by Congress.'" *Virtual Works*, 238 F.3d at 271 (4th Cir.2001) (quoting *Sporty's Farm LLC v. Sportsman's Market, Inc.*, 202 F.3d 489, 495 (2d Cir.2000)). In addition, the ACPA contains a safe harbor provision: Bad faith "shall not be found in any case in which the court determines that the person believed and had a reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

In this case, the district court expressly determined only whether ISS violated the ACPA by registering the domain name *www.epix.cc*—a domain name which Epix now owns and which is not at issue on appeal. The district court did not consider Epix's ACPA claim as it related to ISS's use of the *www.epix.com*.

■■■ The district court found, however, that Tchou and ISS adopted the *www. epix.com* domain name in good faith. In particular, it determined that Tchou adopted the domain name epix.com as a descriptive term to connote electronic pictures. Evidencing his good faith, Tchou performed a web search on "epix" before registering epix.com, but did not find Epix because it was not yet on the Internet. Furthermore, Tchou engaged in a bona fide use of his website. To transform his website into a "widely known internet portal site," Tchou continuously used the domain name and invested money on hardware and software as well as significant amounts of time on the development of a viable business plan.

The district court rejected Epix's farfetched idea that Tchou registered epix. com in an effort to assist his employer and Epix competitor, Intel. The district court did not, however, comment on Epix's other purported evidence of bad faith—ISS's offer to sell Epix the epix.com domain name for $25,000. While offers to sell a contested domain name may in certain circumstances be probative evidence of bad faith, *see Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir.1998), here, the offer to sell came from ISS's attorney in the context of settlement negotiations after the commencement of litigation; Tchou was not even present. Epix never established before the district court that the settlement offer was made to extort Epix or for any reason other than to settle the case. Rather, the evidence suggests that ISS offered to sell its investment in hardware, software, and time in an operational website devoted to the Clinton Street Cabaret.

The district court's finding that Tchou adopted *www.epix.com* in good faith was not clearly erroneous considering the "unique circumstances" of this case. Without a finding of bad faith, Epix's cybersquatting claim necessarily fails.

## III OREGON TRADEMARK DILUTION

■■■ Under Oregon law, if a trademark is distinctive, it is protected against dilution. *See* Or.Rev.Stat. § 647.107. A distinctive trademark must have "favorable associational value in the minds of consumers." *Wedgwood Homes, Inc. v. Lund*, 294 Or. 493, 659 P.2d 377, 380 (1983). Distinctiveness may be developed by "long use, consistent superior quality instilling customer satisfaction, or extensive advertising." *Id.* Here, although Epix registered its EPIX mark in Oregon once this litigation began, Epix produced no evidence that its EPIX mark had favorable associational value in Oregon, or that Epix had even sold any product to an Oregonian. As Epix was unable to prove its EPIX trademark was distinctive in Oregon, the district court correctly found its dilution claim failed as a matter of law.

## IV SCOPE OF THE INJUNCTION

### A. Forced Transfer of www.epix.com.

 The district court found that ISS's "past use of epix.com to promote Tchou's digital image processing services and other computer-related services did infringe on Epix's trademark." To prevent future infringement of Epix's EPIX mark, the district court enjoined ISS and Tchou from marketing electronic imaging services, using gray wallpaper, and using the EPIX. COM logo without an appropriate disclaimer. Unsatisfied with this injunction, Epix contends that, as a matter of law, once the district court found that ISS's past use of epix.com infringed the EPIX trademark, Epix was entitled to ownership of the offending domain name.

Despite its continued representations to the contrary, Epix points us to no case which holds that a finding of trademark infringement *requires* the forced transfer of the infringing property. The best Epix offers is a few cases which preliminarily enjoined the infringer from using an infringing domain name. *See TCPIP Holding*, 244 F.3d at 103; *Brookfield*, 174 F.3d at 1066–67. In *Brookfield*, for example, we preliminarily enjoined West Coast from using the domain name movie-buff.com in direct competition with Brookfield, the owner of the federally registered trademark MOVIEBUFF. 174 F.3d at 1066–67. Despite our findings that West Coast likely infringed Brookfield's MOVIEBUFF mark by using the *www.moviebuff.com* website, we did not order the offending domain name transferred to Brookfield. *Id.*

 Indeed, even if a district court finds infringement, it retains the discretion to fashion any remedy which alleviates that confusion. *Sleekcraft*, 599 F.2d at 355. Certainly, it is not required to enjoin the infringer from all uses of the contested mark. In *Sleekcraft*, for example, the defendant was operating in the same industry (recreational boats) and using substantially the same mark as the plaintiff. 599 F.2d at 346. Instead of completely enjoining the defendant's use of its mark, we fashioned a limited injunction requiring the defendant to place a distinctive logo on all aspects of its business so that consumers could differentiate between the two boat manufacturers. *Id.* at 355. This type of limited injunction "balance[d] the conflicting interests both parties have in the unimpaired continuation of their trademark use." *Id.* at 354.

In fact, only upon proving the rigorous elements of cyber-squatting under the ACPA have plaintiffs successfully forced the transfer of an infringing domain name. *See Sporty's Farm*, 202 F.3d at 495 (forcing cybersquatter to relinquish all rights to sportys.com domain name); *Virtual Works*, 238 F.3d at 271 (requiring Virtual Works to turn over vw.com domain name to Volkswagen). The ACPA specifically authorizes this remedy. *See* 15 U.S.C. § 1125(d)(1)(C). Even in egregious cases of cybersquatting, however, the district court retains discretion to fashion appropriate relief, and it need not force the transfer of the offending domain name. *See N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 60 (1st Cir.2001) (requiring cybersquatter at www.northernlights.com to post a picture of the aurora borealis as well as links to its own webpages and the webpages of the trademark owner, but allowing it to maintain ownership of the domain name).

In this case, the district court did not abuse its discretion by allowing ISS to retain possession of the epix.com domain name. A forced transfer of the domain name was not available by statute because Epix did not prove that ISS violated the

ACPA. Nor did Epix prove that ISS acted in bad faith to infringe Epix's trademark.

Although the district court did find that ISS's references to "bit-twiddling or pixel manipulation, use of gray wallpaper, and use of the EPIX.COM logo, taken together, create an impermissible likelihood of consumers affiliating epix.com with [Epix]'s registered mark," it found these past infringing uses were minimal and incidental to the primary purpose of ISS's website. Most importantly, the district court determined that ISS predominantly used the website benignly to promote the Clinton Street Cabaret and its performance of *Rocky Horror.*

We think the injunction crafted by the district court appears particularly proper. EPIX is used by many companies to identify a variety of goods and services, including medical imaging agents and men's and women's clothing. Moreover, the term "epix" appears ubiquitously on the Internet as shorthand for electronic pictures, and the value of epix.com is derived from this descriptive force, not from the goodwill and built by Epix. In these circumstances, nothing gives Epix any more right to epix.com than any other user of the EPIX mark.

Thus, we hold that the district court committed no legal error or abuse of discretion in refusing to transfer the domain name to Epix. To the contrary, the district court's injunction appropriately resolved this case. It ensured no future infringement of the EPIX mark by ISS or Tchou, while permitting Tchou to retain his property and reap the benefits of his investment.

**B. Subsequent Purchasers or Assignees**

Epix apparently believes that ISS and Tchou intend to evade the injunction by transferring epix.com to a third party. Anxious over this prospect, Epix asks us to broaden the injunction to include ISS's and Tchou's successors and assigns of the *epix.com* domain name. Epix moved the district court to amend its injunction to bind future users of epix.com, but the district court denied its motion.

The Supreme Court has upheld injunctions which apply to "successors and assigns." *Regal Knitwear v. NLRB,* 324 U.S. 9, 14–15, 65 S.Ct. 478, 89 L.Ed. 661 (1945). Crafting an injunction without such language invites defeat by assignment; at the very least, it leaves open an avenue for further litigation. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1298 (9th Cir.1992). Epix points to nothing, however, which mandates that injunctions apply to successors and assigns. Rather, the scope of the injunction remains within the prudent discretion of the district court.

In this case, extending the injunction to include ISS's and Tchou's successors and assigns could be unduly burdensome in certain circumstances. For instance, successors and assigns should not be bound by an injunction if Epix terminates or abandons its use of the EPIX mark, halts use of the mark on electronic imaging equipment, or otherwise relinquishes its status as the senior user. Moreover, successors and assigns should not be bound by the injunction if the EPIX mark is found to be generic as it relates to electronic imaging equipment. We, therefore, hold that the district court did not abuse its discretion in crafting the present injunction, and we refuse Epix's request to broaden the injunction.

**CONCLUSION**

The district court's decision is AFFIRMED.