**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BOSLEY MEDICAL INSTITUTE, INC., a
Delaware corporation,
          *Plaintiff-Appellant,*

          and

BOSLEY MEDICAL GROUP, S.C., an
Illinois corporation,
                    *Plaintiff,*

          v.

MICHAEL STEVEN KREMER,
          *Defendant-Appellee.*

No. 04-55962

D.C. No.
CV-01-01752-WQH

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted
March 8, 2005—Pasadena, California

Filed April 4, 2005

Before: Thomas G. Nelson, Barry G. Silverman, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Silverman

**COUNSEL**

Diana M. Torres, O'Melveny & Myers, Los Angeles, California, for the plaintiff-appellant.

Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for the defendant-appellee.

**OPINION**

SILVERMAN, Circuit Judge:

Defendant Michael Kremer was dissatisfied with the hair restoration services provided to him by the Bosley Medical

Institute, Inc. In a bald-faced effort to get even, Kremer started a website at www.BosleyMedical.com, which, to put it mildly, was uncomplimentary of the Bosley Medical Institute. The problem is that "Bosley Medical" is the registered trademark of the Bosley Medical Institute, Inc., which brought suit against Kremer for trademark infringement and like claims. Kremer argues that noncommercial use of the mark is not actionable as infringement under the Lanham Act. Bosley responds that Kremer is splitting hairs.

Like the district court, we agree with Kremer. We hold today that the noncommercial use of a trademark as the domain name of a website — the subject of which is consumer commentary about the products and services represented by the mark — does not constitute infringement under the Lanham Act.

Bosley Medical's cybersquatting claim is another matter. The issue under the Anticybersquatting Consumer Protection Act was whether Kremer had a "bad faith intent to profit" from the use of the trademark in his domain name, such as by making an extortionate offer to sell the BosleyMedical.com site to Bosley. Because discovery regarding that claim had not been completed, and the issue itself was not within the scope of the summary judgment motions, the district court erred in granting summary judgment to Kremer as to cybersquatting.

Finally, we hold that the district court should not have granted Kremer's motion to strike Bosley Medical's state-law claims pursuant to the California anti-SLAPP statute. Bosley Medical's complaint about the unauthorized use of its trademark as Kremer's domain name was not so lacking in merit as to be susceptible to an anti-SLAPP motion to strike at an early stage of the case.

## I.  Background

Bosley Medical provides surgical hair transplantation, restoration, and replacement services to the public. Bosley Medical owns the registered trademark "BOSLEY MEDICAL,"[1] has used the mark "BOSLEY MEDICAL" since 1992, and registered the mark with the United States Patent and Trademark Office in January 2001. Bosley has spent millions of dollars on advertising and promotion throughout the United States and the rest of the world.

Michael Kremer is a dissatisfied former patient of Bosley. Unhappy with the results of a hair replacement procedure performed by a Bosley physician in Seattle, Washington, he filed a medical malpractice lawsuit against Bosley Medical in 1994. That suit was eventually dismissed.

In January 2000, Kremer purchased the domain name www.BosleyMedical.com, the subject of this appeal, as well as the domain name www.BosleyMedicalViolations.com, which is not challenged by Bosley. Five days after registering the domain name, Kremer went to Bosley Medical's office in Beverly Hills, California and delivered a two-page letter to Dr. Bosley, Founder and President of Bosley Medical. The first page read:

> Let me know if you want to discuss this. Once it is
> spread over the internet it will have a snowball effect
> and be too late to stop. M. Kremer [phone number].
> P.S. I always follow through on my promises.

The second page was entitled "Courses of action against BMG" and listed eleven items. The first item stated: "1. Net web sites disclosing true operating nature of BMG. Letter 3/

[1]Bosley also owns the following trademarks: BOSLEY, BOSLEY HEALTHY HAIR, BOSLEY HEALTHY HAIR FORMULA, and BOSLEY HEALTHY HAIR COMPLEX.

14/96 from LAC D.A. Negative testimonials from former clients. Links. Provide BMG competitors with this information." The letter contains no mention of domain names or any other reference to the Internet.

Kremer began to use www.BosleyMedical.com in 2001. His site summarizes the Los Angeles County District Attorney's 1996 investigative findings about Bosley, and allows visitors to view the entire document. It also contains other information that is highly critical of Bosley. Kremer earns no revenue from the website and no goods or services are sold on the website. There are no links to any of Bosley's competitors' websites. BosleyMedical.com does link to Kremer's sister site, BosleyMedicalViolations.com, which links to a newsgroup entitled alt.baldspot, which in turn contains advertisements for companies that compete with Bosley. BosleyMedical.com also contained a link to the Public Citizen website. Public Citizen is the organization that represents Kremer in this case.

Bosley brought this suit alleging trademark infringement, dilution, unfair competition, various state law claims, and a libel claim that was eventually settled. Bosley sought to take discovery aimed at the trademark and libel claims. The magistrate judge granted limited discovery on the libel claims. Following discovery, Bosley dismissed the libel claims and amended the complaint.

Kremer moved to dismiss the First Amended Complaint and in addition moved for partial summary judgment on the issues of commercial use and likelihood of confusion. Bosley filed a cross-motion for partial summary judgment on the infringement and dilution claims. Kremer agreed that the facts were undisputed with regard to the issues of commercial use and likelihood of confusion, and that these issues were ripe for summary judgment.

Ruling that Kremer's use of "Bosley Medical" in the domain name was noncommercial and unlikely to cause con-

fusion, the district court entered summary judgment for Kremer on the federal claims and dismissed the state law claims under Claifornia's anti-SLAPP statute. Bosley now appeals.

## II.   Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291 and review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005). A district court's grant of a special motion to strike under California's anti-SLAPP statute, Cal. Civ. P. Code § 425.16, is also reviewed de novo. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1102 (9th Cir. 2003).

## III.   Analysis

### A.   Trademark Infringement and Dilution Claims

**[1]** The Trademark Act of 1946 ("Lanham Act") prohibits uses of trademarks, trade names, and trade dress that are likely to cause confusion about the source of a product or service. *See* 15 U.S.C. §§ 1114, 1125(a). In 1996, Congress amended § 43 of the Lanham Act to provide a remedy for the dilution of a famous mark. *See* 15 U.S.C. § 1125(c).

**[2]** Infringement claims are subject to a commercial use requirement. The infringement section of the Lanham Act, 15 U.S.C. § 1114, states that any person who "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . ." can be held liable for such use. 15 U.S.C. § 1114(1)(a).

**[3]** In 1996, Congress expanded the scope of federal trademark law when it enacted the Federal Trademark Dilution Act

("FTDA"). The FTDA allows the "owner of a famous mark" to obtain "an injunction against another person's *commercial use in commerce* of a mark or trade name . . . ." 15 U.S.C. § 1125(c)(1) (emphasis added). While the meaning of the term "commercial use in commerce" is not entirely clear, we have interpreted the language to be roughly analogous to the "in connection with" sale of goods and services requirement of the infringement statute. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002) ("Although this statutory language is ungainly, its meaning seems clear: It refers to a use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner."); *see also Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, 261 F. Supp. 2d 502, 517 (E.D. Va. 2003) (holding that the commercial use requirement of the FTDA is "virtually synonymous with the 'in connection with the sale, offering for sale, distribution, or advertising of goods and services' requirement" of the Lanham Act).

The inclusion of these requirements in the Lanham Act serves the Act's purpose: "to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (internal quotation marks and citations omitted). In other words, the Act is designed to protect consumers who have formed particular associations with a mark from buying a competing product using the same or substantially similar mark and to allow the mark holder to distinguish his product from that of his rivals. *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999).

The Supreme Court has made it clear that trademark infringement law prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers. *See Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) ("A trade-mark only gives the right to prohibit the use of it so far

as to protect the owner's good will against *the sale of another's product as his*." [emphasis added]); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205 (1942) (explaining that the main purpose of the Lanham Act is to prevent the use of identical or similar marks in a way that confuses the public about the actual source of goods and services).

As the Second Circuit held, "[t]he Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another . . . . [T]rademark infringement protects only against mistaken *purchasing decisions* and not against confusion generally." *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 1991) (internal quotation marks and citation omitted) (emphasis added).

As a matter of First Amendment law, commercial speech may be regulated in ways that would be impermissible if the same regulation were applied to noncommercial expressions. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). "The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Mattel*, 296 F.3d at 900 (internal quotation marks and citations omitted).

The district court ruled that Kremer's use of Bosley's mark was noncommercial. To reach that conclusion, the court focused on the "use in commerce" language rather than the "use in connection with the sale of goods" clause. This approach is erroneous. "Use in commerce" is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 185 (W.D.N.Y. 2000). 15 U.S.C. § 1127 states that "unless the contrary is plainly apparent from the context

. . . [t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." Therefore, the district court should have determined instead whether Kremer's use was "in connection with a sale of goods or services" rather than a "use in commerce." However, we can affirm the district court's grant of summary judgment on any ground supported by the record. *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1143 (9th Cir. 2003). The question before us, then, boils down to whether Kremer's use of Bosley Medical as his domain name was "in connection with a sale of goods or services." If it was not, then Kremer's use was "noncommercial" and did not violate the Lanham Act.

Bosley argues that it has met the commercial use requirement in three ways. First, it argues that a mark used in an otherwise noncommercial website or as a domain name for an otherwise noncommercial website is nonetheless used in connection with goods and services where a user can click on a link available on that website to reach a commercial site. *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004). However, Bosley's reliance on *Nissan* is unfounded.

**[4]** In *Nissan*, Nissan Motor Company sued Nissan Computer Corporation for using the Internet websites www.Nissan.com and www.Nissan.net. *Id.* at 1006. In *Nissan*, however, commercial use was undisputed, as the core function of the defendant's website was to advertise his computer business. *Id.* Additionally, the defendant in *Nissan*, like the defendant in *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003), placed links to other commercial businesses directly on their website. 319 F.3d at 772-73. Kremer's website contains no commercial links, but rather contains links to a discussion group, which in turn contains advertising. This roundabout path to the advertising of others is too attenuated to render Kremer's site commercial. At no time did Kremer's BosleyMedical.com site offer for sale any product or service or contain paid advertisements from any other commercial

entity. *See TMI, Inc. v. Maxwell*, 368 F.3d 433, 435, 438 (5th Cir. 2004) (holding that the commercial use requirement is not satisfied where defendant's site had no outside links).

**[5]** Bosley also points out that Kremer's site contained a link to Public Citizen, the public interest group representing Kremer throughout this litigation. We hold that Kremer's identification of his lawyers and his provision of a link to same did not transform his noncommercial site into a commercial one.

**[6]** Bosley's second argument that Kremer's website satisfies the "in connection with the sale of goods or services" requirement of the Lanham Act is that Kremer created his website to enable an extortion scheme in an attempt to profit from registering BosleyMedical.com. In *Panavision International, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998), this court held that a defendant's "commercial use was his attempt to sell the trademarks themselves." *Id*. at 1325. Similarly, in *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227 (N.D. Ill. 1996), the court found that "Toeppen's intention to arbitrage the 'intermatic.com' domain name constitute[d] a commercial use." *Id*. at 1239; *see also Boston Prof'l Hockey Ass'n., Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir. 1975) (holding that trademark law protects the trademark itself, despite the fact that only "a reproduction of the trademark itself is being sold, unattached to any other goods or services").

**[7]** However, in this case, there is no evidence that Kremer was trying to sell the domain name itself. The letter delivered by Kremer to Bosley's headquarters is a threat to expose negative information about Bosley on the Internet, but it makes no reference whatsoever to ransoming Bosley's trademark or to Kremer's use of the mark as a domain name.

Bosley argues that it was denied an opportunity to pursue discovery on commercial use, and had it been allowed to pro-

ceed with discovery, it could further establish that Kremer has attempted to sell the domain name. However, in opposing Kremer's motion for summary judgment, Bosley did not make any such objections. Bosley failed to request further discovery under Federal Rule of Civil Procedure 56(f), but instead moved for summary judgment itself. Although Bosley's reply brief supporting its own motion for summary judgment complained about limited discovery in a footnote, Bosley did not move for leave to take discovery. The district court did not abuse its discretion in granting the summary judgment without permitting further discovery.

Bosley's third and final argument that it satisfied the commercial use requirement of the Lanham Act is that Kremer's use of Bosley's trademark was in connection with *Bosley's* goods and services. In other words, Kremer used the mark "in connection with goods and services" because he prevented users from obtaining the plaintiff's goods and services. *See People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001) ("PETA"). In *PETA*, defendants created a site that promoted ideas antithetical to those of the PETA group. *Id.* at 362-63. The Fourth Circuit held that the defendant's parody site, though not having a commercial purpose and not selling any goods or services, violated the Lanham Act because it "prevented users from obtaining or using PETA's goods or services." *Id.* at 365.

**[8]** However, in *PETA*, the defendant's website "provide[d] links to more than 30 commercial operations offering goods and services." *Id.* at 366. To the extent that the *PETA* court held that the Lanham Act's commercial use requirement is satisfied because the defendant's use of the plaintiff's mark as the domain name may deter customers from reaching the plaintiff's site itself, we respectfully disagree with that rationale. While it is true that www.BosleyMedical.com is not sponsored by Bosley Medical, it is just as true that it is *about* Bosley Medical. The *PETA* approach would place most critical, otherwise protected consumer commentary under the

restrictions of the Lanham Act. Other courts have also rejected this theory as over-expansive. *See L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987); *see also Ford Motor Co. v. 2600 Enters.*, 177 F. Supp. 2d 661, 664 (E.D. Mich. 2001).

The *PETA* court's reading of the Lanham Act would encompass almost all uses of a registered trademark, even when the mark is merely being used to identify the object of consumer criticism.[2] This broad view of the Lanham Act is supported by neither the text of the statute nor the history of trademark laws in this country. "[T]rademark laws are intended to protect" consumers from purchasing the products of an infringer "under the mistaken assumption that they are buying a product produced or sponsored by [the trademark holder]." *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 450 (S.D.N.Y. 1982). Limiting the Lanham Act to cases where a defendant is trying to profit from a plaintiff's trademark is consistent with the Supreme Court's view that "[a trademark's] function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918); *see also* 1 McCarthy on Trademarks and Unfair Competition § 2:7 (4th ed. 2004).

**[9]** The Second Circuit held in *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997), that the "use in connection with the sale of goods and services" requirement of the Lanham Act does not require any actual *sale* of goods and services. Thus, the

---

[2]In fact, such a holding would suggest that any time a non-holder of a trademark uses the mark as his domain name, he would violate the Lanham Act. However, when Congress amended the Lanham Act to add the Anticybersquatting Consumer Protection Act, it limited violations only to situations where a person registers the site with a bad faith intent to profit. To find a Lanham Act violation without finding commercial use may contradict Congress' intent.

appropriate inquiry is whether Kremer offers *competing* services to the public. Kremer is not Bosley's competitor; he is their critic. His use of the Bosley mark is not in connection with a sale of goods or services — it is in connection with the expression of his opinion *about* Bosley's goods and services.

**[10]** The dangers that the Lanham Act was designed to address are simply not at issue in this case. The Lanham Act, expressly enacted to be applied in commercial contexts, does not prohibit all unauthorized uses of a trademark. Kremer's use of the Bosley Medical mark simply cannot mislead consumers into buying a competing product — no customer will mistakenly purchase a hair replacement service from Kremer under the belief that the service is being offered by Bosley. Neither is Kremer capitalizing on the good will Bosley has created in its mark. Any harm to Bosley arises not from a competitor's sale of a similar product under Bosley's mark, but from Kremer's criticism of their services. Bosley cannot use the Lanham Act either as a shield from Kremer's criticism, or as a sword to shut Kremer up.[3]

## B.  Anticybersquatting Consumer Protection Act

In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting.

> [C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.

---

[3]Because we hold that Kremer's use of Bosley's mark was noncommercial, we do not reach the issue of initial interest confusion which was addressed in *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936 (9th Cir. 2002).

*DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004) (internal quotation marks omitted).

The ACPA states:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark . . . ; and (ii) registers, traffics in, or uses a domain name [that is confusingly similar to another's mark or dilutes another's famous mark].

15 U.S.C. § 1125(d)(1)(A) (2004).

The district court dismissed Bosley's ACPA claim for the same reasons that it dismissed the infringement and dilution claims — namely, because Kremer did not make commercial use of Bosley's mark. However, the ACPA does not contain a commercial use requirement, and we therefore reverse.

Kremer argues that the "noncommercial use" proviso that appears in the dilution portion of § 1125 applies to cybersquatting claims with equal force. Admittedly, the language in § 1125 is confusing. 15 U.S.C. § 1125(c)(4) reads: "The following shall not be actionable under this section: . . . (B) Noncommercial use of a mark." 15 U.S.C. § 1125(c)(4)(B). Kremer asserts that by using the word "section," rather than the more precise term "subsection," Congress meant for the proviso to apply to all of § 1125, as opposed to subsection (c).

[11] This argument fails for two reasons. The noncommercial use exception, which appears in a different part of the Lanham Act, is in direct conflict with the language of the ACPA. The ACPA makes it clear that "use" is only one possible way to violate the Act ("registers, traffics in, *or* uses"). Allowing a cybersquatter to register the domain name with a bad faith intent to profit but get around the law by making

noncommercial use of the mark would run counter to the purpose of the Act. "[T]he use of a domain name in connection with a site that makes a noncommercial or fair use of the mark does not necessarily mean that the domain name registrant lacked bad faith." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir. 2004) (internal quotation marks and citation omitted); *see also* H.R. Rep. No. 106-412 at 11 (1999) ("This factor is not intended to create a loophole that otherwise might swallow the bill, however, by allowing a domain name registrant to evade application of the Act by merely putting up a noninfringing site under an infringing domain name."). "It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983); *see also Albertson's, Inc. v. Commissioner*, 42 F.3d 537, 546 (9th Cir. 1994).

Additionally, one of the nine factors listed in the statute that courts must consider is the registrant's "bona fide noncommercial or fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(IV). This factor would be meaningless if the statute exempted all noncommercial uses of a trademark within a domain name. We try to avoid, where possible, an interpretation of a statute "that renders any part of it superfluous and does not give effect to all of the words used by Congress." *Nevada v. Watkins*, 939 F.2d 710, 715 (9th Cir. 1991) (internal quotation marks and citation omitted).

**[12]** Finally, other courts that have construed the ACPA have not required commercial use. In *DaimlerChrysler*, the Sixth Circuit held that a

> trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is iden-

tical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit.

388 F.3d at 204. *See also Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1047-48 (S. D. Tex. 2001), *aff'd*, 286 F.3d 270 (5th Cir. 2002) ("As reflected by the language of the ACPA and the case law interpreting it, there is no requirement . . . that the 'use' be a commercial use to run afoul of the ACPA").

**[13]** The district court erred in applying the commercial use requirement to Bosley's ACPA claim. Rather, the court should confine its inquiry to the elements of the ACPA claim listed in the statute, particularly to whether Kremer had a bad faith intent to profit from his use of Bosley's mark in his site's domain name. Bosley has met the first prong of the ACPA (that the domain name is identical to the mark) because Kremer used an unmodified version of Bosley's mark as his domain name.

Concluding that all of Bosley's claims, including the ACPA claim, were subject to a commercial use requirement, the district judge granted summary judgment in Kremer's favor. But the ACPA claim was not in front of the district court in the motions for summary judgment. The court did not provide notice to Bosley that it would rule on this claim, and did not give Bosley an opportunity to conduct discovery on the issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). For this reason, the district court erred in granting summary judgment for Kremer on the ACPA claim. It remains to be seen whether Bosley can establish that Kremer registered the domain name in bad faith or can authenticate other letters that Bosley alleges were written and sent by Kremer.

## C.   California's Anti-SLAPP Law

[14] In 1993, responding to the "disturbing increase in law-suits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," the California Legislature enacted the Anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute. Cal. Civ. Proc. Code § 425.16(a). "The hall-mark of a SLAPP suit is that it lacks merit, and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned, and of deterring future litigation." *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-71 (9th Cir. 1999) (citing *Wilcox v. Superior Court*, 33 Cal. Rptr. 2d 446, 449-50 (Cal. Ct. App. 1994)). The anti-SLAPP statute was designed to curtail these lawsuits by establishing a procedure to promptly expose and dismiss meritless and harassing claims seeking to chill protected expression. The statute provides that a defendant may move to strike a plaintiff's complaint if it "aris[es] from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1).

A defendant filing an anti-SLAPP motion to strike "must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech." *Braun v. Chronicle Publ'g Co.*, 61 Cal. Rptr. 2d 58, 61 (Cal. Ct. App. 1997). The defendant need not show that plaintiff's suit was brought with the intention to chill defendant's speech; the plaintiff's "intentions are ultimately beside the point." *Equilon Enters.*, *LLC v. Consumer Cause*, *Inc.*, 124 Cal. Rptr. 2d 507, 519 (Cal. 2002).

[15] The district court ruled that Bosley was seeking to limit Kremer's free speech and granted Kremer's anti-SLAPP motion to strike Bosley's state law trademark claims. We now

reverse. An infringement lawsuit by a trademark owner over a defendant's unauthorized use of the mark as his domain name does not *necessarily* impair the defendant's free speech rights. As noted by the Second Circuit, "[d]omain names . . . *per se* are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses particular circumstances presented with respect to each domain name." *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 585 (2d Cir. 2000). In *Panavision*, we stated that "[a] significant purpose of a domain name is to identify the entity that owns the web site," 141 F.3d at 1327, and we explained in *Mattel* that a source identifier is not entitled to full First Amendment protection. 296 F.3d at 900. While a summary judgment motion might have been well-taken, an anti-SLAPP motion to strike was not. We reverse the grant of the anti-SLAPP motion to strike and remand to the district court for further proceedings on the state law claims.

## IV.   Conclusion

We affirm the district court's entry of summary judgment in favor of Kremer with respect to the infringement and dilution claims. We remand the ACPA claim for further proceedings. The district court's grant of the anti-SLAPP motion to strike the state law claims is reversed.

AFFIRMED in part, REVERSED in part, and REMANDED. No costs allowed.