Filed 5/9/14  Ocean's Eleven Casino v. Anders CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OCEAN'S ELEVEN CASINO, | D063269 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00055763-CU-DF-NC) |
| TIM ANDERS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Jacqueline M. Stern, Judge.  Reversed and remanded with directions.

The McMillan Law Firm and Scott A. McMillan for Defendant and Appellant.

Ogletree, Deakins, Nash, Smoak & Stewart, Spencer C. Skeen, Tim L. Johnson and Noam Glick for Plaintiff and Respondent.

Ocean's Eleven Casino (Ocean's Eleven) brought a complaint alleging trade defamation, among other causes of action, against several defendants, including Tim Anders.  The superior court denied Anders's motion to strike the complaint under Code of

Civil Procedure[1] section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute. Anders appeals.

We determine that the court erred in denying Anders's motion to strike. Anders showed that Ocean's Eleven's suit arose out of his exercise of free speech, namely the posting of negative comments about Ocean's Eleven on a website. Anders's comments were made in a public forum and concerned an issue of public interest. In addition, we conclude that Ocean's Eleven did not satisfy its burden of showing a probability of prevailing on its claims. We therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

Ocean's Eleven filed a complaint for (1) trade disparagement, (2) intentional interference with economic relationships, (3) trademark infringement, (4) violation of the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d); ACPA), (5) conversion, (6) misappropriation of trade secrets, (7) trespass, and (8) preliminary and permanent injunction against Anders, Alpine Publishing (a fictitious business name of Anders), Todd Chaney, and Chaney Electric (a fictitious business name of Chaney).

The complaint alleged as follows:

Located in Oceanside, California, Ocean's Eleven is one of Southern California's most well-known and respected cardrooms and casinos. In operation since 1997, Ocean's Eleven is a major contributor to San Diego County's economy and employs hundreds of

---

[1] Statutory references are to the Code of Civil Procedure unless otherwise specified.

local residents. Ocean's Eleven is a partnership between Oceans 11 Casino, Inc. and North County Gaming, Inc.

Chaney is the owner of Chaney Electric. He is a friend of Robert Moyer, the former general manager of Ocean's Eleven. Chaney performed various contracting jobs at Ocean's Eleven over the past several years. In 2010, Ocean's Eleven hired a new managing partner and Ocean's Eleven ceased using Chaney's services.

A couple years later, Chaney entered a restricted area in Ocean's Eleven's casino and took confidential company memoranda. Chaney then proceeded to make certain allegations against Ocean's Eleven and its managing partner, Robert Carter, including that Carter was having an inappropriate sexual relationship with one of Ocean's Eleven's employees, Carter was receiving illegal kickbacks from Ocean's Eleven's suppliers, and Carter was misusing Ocean's Eleven's funds. Ocean's Eleven investigated Chaney's claims, but did not find they were valid.

Anders is a professional poker player, friend of Chaney and Moyer, and former patron of Ocean's Eleven. On the same day Chaney stole confidential company memoranda, Anders sent a letter to Walter Lack, an owner of Ocean's 11 Casino, Inc. The letter allegedly defamed Ocean's Eleven and its managing partner. The complaint does not detail the specific defamatory statements of the letter, but avers that it falsely accuses Ocean's Eleven of wrongfully terminating elderly employees.

As part of Ocean's Eleven's investigation into Chaney's claims, Anders was interviewed. During the interview, Anders admitted to receiving confidential company memoranda and having other confidential information about Ocean's Eleven and its

3

employees. Anders refused to disclose how he obtained the confidential information. Because Anders would not divulge this information, Ocean's Eleven barred Anders from the casino.

Anders, on behalf of himself and Alpine Publishing, created a webpage with the domain name www.oceans11.info. On both this webpage and Anders's personal Facebook page, Anders posted false and defamatory statements about Ocean's Eleven, "including but not limited to statements that Ocean's Eleven and its management have committed unlawful and illegal business practices." In addition, Anders posted his letter to Lack as well as posting comments that Ocean's Eleven has engaged in age discrimination, wrongfully terminated employees, and that Anders was banned from Ocean's Eleven's casino for writing his letter to Lack. Anders's website also includes a message board that encourages other people to post defamatory comments about Ocean's Eleven and its management.

In addition, Anders's website uses Ocean's Eleven's "trademarks, symbols, logos, and URL" without permission. Ocean's Eleven sent Anders a cease and desist letter, demanding that he immediately remove Ocean's Eleven's trademarks and logos from his website and forego publishing and distributing "false information, lies, and rumors about Ocean's Eleven and its management." Anders refused to take corrective action, and thus, Ocean's Eleven filed suit.

Ocean's Eleven's causes of action for trade disparagement, intentional interference with economic relationships, trademark infringement, and violation of ACPA are based on Anders's use of the website as described above.

4

Ocean's Eleven's claim for conversion involves an allegation made on information and belief that Anders conspired with Chaney to steal Ocean's Eleven's confidential company information and private employee information and refused to return it. Ocean's Eleven alleged that the stolen confidential information comprised trade secrets; thus, it sued all defendants for misappropriation of trade secrets as well.

Ocean's Eleven bases its trespass claim on the allegation that Anders sent his agents into Ocean's Eleven's casino to distribute flyers regarding Anders's website. Its claim for preliminary and permanent injunction sought to enjoin Anders from engaging in the alleged conduct and to cease using Ocean's Eleven's trademark and logos.

In addition to answering the complaint, Anders moved to strike the complaint under the anti-SLAPP statute, arguing the complaint arose from acts protected under free speech and petition rights guaranteed by the federal and state Constitutions, and Ocean's Eleven was not likely to prevail on the merits. In support of his motion, Anders filed: (1) his letter to Lack; (2) Lack's response to Anders's letter; (3) several screen shots from Anders's website with the domain name www.oceans11.info, including posted comments; (4) a declaration from Anders; (5) a minute order dismissing a restraining order request of Mark Kelegian against Anders; (6) a declaration from Sherry Trudell; (7) a declaration from Randall Vanderiet; (8) an Ocean's Eleven's memorandum dated June 18, 2012; and (9) an Ocean's Eleven's memorandum dated June 20, 2012.

In his declaration, Anders provides some background information that expanded on or refuted some of the allegations in the complaint. He explained that he is a children's book author, musician, and professional poker player. He has been a customer

of Ocean's Eleven since it opened and remains good friends with some of the owners of Ocean's Eleven as well as several of its employees.

After an adjustment in management that resulted in Mark Kelegian becoming the casino manager, Anders noticed some changes at Ocean's Eleven. Several employees approached Anders and conveyed they were upset by how poorly Kelegian was treating them. Anders also noted that long time employees were terminated and replaced by younger employees. When four elderly receptionists were fired, Anders "felt [he] needed to act." As such, he wrote a letter to Lack. In the letter, Anders tells Lack that Ocean's Eleven's casino was his "all time favorite." However, Anders explains, based on a "long list of poor choices . . . by Mark [Kelegian]" that included terminating the employment of certain receptionists and creating a "grumpy environment that no one wants to be around[,]" his enjoyment of Ocean's Eleven's casino has greatly diminished. Anders implores Lack to rehire the recently laid off receptionists and replace Kelegian with someone else (he suggests three individuals).

Lack wrote Anders back, thanking him for the "thoughtful" letter and acknowledging that Anders made "some very good points that will be shared with other owners."

Anders stated that he is not friends with Chaney, but had met him at a dinner party for Moyer. Chaney contacted Anders to discuss Ocean's Eleven. During the course of their conversation, Anders told Chaney about his letter to Lack. Chaney asked for a copy of the letter so he could show it to Bob Carter, another owner of Ocean's Eleven. Anders provided Chaney with a copy of his letter.

6

Anders's website, as it appears through screenshots in the record, begins with the words "SPEAK UP!" that is followed by an introduction to Anders: "Dr. Hope, J.A.P.D. (Just A Pretend Doctor) Author, Musician, Poker Player, and All Around Silly Guy, whose real name is Tim Anders." The website then provides the following introduction:

> "[Anders] was banned from Ocean's Eleven Casino on July 10, 2012. [¶] The reason: Caring too much about the employees. [¶] So what happened? [¶] Ever since Bob Moyer (the former managing partner) retired and Mark Kelegian (an attorney) took control of Ocean's Eleven Casino, there has been discontent amongst the employees. They don't like the way that they are being treated by the new management and this discontent can be felt by the customers as well. If the poker dealers talk about how they feel to a customer, Mark has said that they will be fired. [¶] When the management (Mark Kelegian) decided to fire the sweet elderly receptionists and replace them with younger males, Tim 'Dr. Hope' Anders felt this was just wrong. Rather than just watch as injustice after injustice was being done he chose to write a letter to the partner who held the majority interest in the club and talk about their termination. He took action in the hope that he might save their jobs and improve the conditions for the other workers. A short time after Mark saw a copy of that letter, Mark had Tim banned from Ocean's Eleven."

The website has a link to the letter to Lack and then asks readers to post their opinions. Before reaching the comments section, the website includes a couple inspirational sayings about speaking out and standing up for others. In addition, the website provides: "If this is too serious for you and you just want a laugh, check out Dr. Hope's Crazy Poker Hip Hop video" with a link to the video.

The comments section of the website contains over 100 anonymous comments except for a few comments that specifically state they are from Anders. The majority of the comments discuss the changes at Ocean's Eleven and the commenter's opinion of

7

those changes.  A good number of the comments discuss opinions regarding the negative impact of the changes at Ocean's Eleven:

> "If you were getting it from behind like most of us employees, you would have a different perspective.  The ones that are at the top dont [sic] care because it doesnt [sic] effect [sic] them.  I am going to get out ASAP.

> "Place is still so down.  So many of [us] used to be everyday players are [sic] still gonna go and play everyday somewhere else until something really changes.

> "It is sad Ocean's Eleven has changed so much from the fun place it used to be.

> "It'll never be what it was not that long ago.  It's more than sad, it's very similar to watching something you love die . . . Slowly.

> "I've been in this business for over 30 years and had never seen such a turn in employee moral [sic] and customer decline, I can't believe that the owners are not aware of the bottom line, ofcourse [sic] Mark [Kelegian] saved them lots of money at the employees [sic] expense, those of us that continue our loyalty to the company have no hope of ever recovering what we work so hard for and was taken from us as long as Mark [Kelegian] is in control.

> "The environment has changed so much that it's no longer the fun hangout."

Several comments also criticize Kelegian.  These comments range from disapproval of Kelegian's management style (inexperienced, managing by fear, cheap, unfriendly, "Holier Than Thou," "vicious," and "cruel") to name calling ("the destroyer," "control freak," "hot-headed," "chauvinist," "jerk").  Some of the comments are colorful: "[Kelegian] has the people skills of an ant."; "[Kelegian] the destroyer is here and he should just go back to his lawyer practice, taking advantage of people."; "It is lucky for [Kelegian] that he has a 'Rich Daddy' who could look after him."; "[Kelegian] is totally

8

incompetent and inhuman [sic] to ever run a poker room.  If you do not care about your investment in Oceans 11 keep doing nothing.  The problem is Black Cloud Mark and until he is gone Oceans 11 is dying a slow death."

The website also includes positive comments.  For example:

". . . there has [sic] been some positive changes made to Ocean's 11 for employee's [sic] and for player's [sic] and in [Kelegian's] behavior toward's [sic] all.

"Let's all take a positive attitude and move forward, life is too short not to enjoy your job.  We need to start smiling again and put our pride in doing a good job above all this.  A positive attitude can be infectious, just like this negative one.

"I'm happy with many changes but not the way some where [sic] handle [sic].

"There is always another side of the story.  The problems with Oceans eleven 4-5 years ago which is all connected to old management who has people skills but no clue about managing casino. . . . Thanks to old management which cause [sic] so much unfair treatments [sic], favoritisms [sic] . . . and broken laws that when [Kelegian] start [sic] to fix these problems it was too late. . . . [Kelegian] did stop a lot of bad problems about to come against Ocean's Eleven Casino. . . . If [Kelegian] had a professional, experienced and trusty [sic] supporting team that fixing the problems we would not be here to argue his management skills.  I am asking current employees to be patient and to be professional. . . . Lets [sic] all be positive and start trusting each other again so we can have better future."

The comments also include posts supporting Anders's efforts against Ocean's Eleven, discussing specific employees and/or work issues, and talking about ownership of Ocean's Eleven.

Ocean's Eleven opposed Anders's anti-SLAPP motion, arguing the focus of its complaint is Anders's theft of its confidential information, the complaint presents no

9

public issue, and there is a probability it will prevail on the merits of its claims. In support of its opposition, Ocean's Eleven filed the declaration of Steve Gallagher, the declaration of Kelegian with six exhibits attached,[2] and the declaration of Spencer Skeen with two exhibits attached.[3]

The Gallagher declaration lists three defamatory statements he attributes to Anders:

> "If poker dealers talk about how they feel to a customer, [Kelegian] has said they will be fired.
>
> "A short time after [Kelegian] saw a copy of that letter [to Lack], [Kelegian] had [Anders] banned from Ocean's Eleven.
>
> "As you know [Kelegian] had me banned from Ocean's Eleven, my crime? Being concerned about the treatment of employees."

The Kelegian declaration repeats these statements, but not does offer any additional defamatory statements.

Ocean's Eleven also objected to portions of the declarations of Anders, Trudell, and Vanderiet.

---

[2] These exhibits are: (1) a reporter's transcript of an August 10, 2012 hearing; (2) a certificate of renewal of a service mark for Ocean's Eleven; (3) a screenshot of a website apparently soliciting donations to support Anders's litigation defense; (4) photocopies of two cards featuring Anders, one directing people to his "Crazy Poker Hip Hop" video and the other referencing the video and containing a link explaining how Anders "love of free speech" got him "in trouble"; (5) an internet article entitled "Award-winning Children's Book Author Gets Banned from Casino"; and (6) an alleged flyer.

[3] These exhibits are: (1) a September 11, 2012 letter from Ocean's Eleven's counsel to Anders's counsel; and (2) a September 25, 2012 letter from Ocean's Eleven's counsel to Anders's counsel.

Anders filed a reply to Ocean's Eleven's opposition and objected to Gallagher's declaration, Kelegian's declaration and exhibits number 3 through 6 attached to it, and Skeen's declaration and the exhibits attached to that declaration.

After considering the evidence in support of and in opposition to the anti-SLAPP motion and hearing oral argument, the court issued a minute order denying the motion. The court found that Anders did not carry his burden of showing that Ocean's Eleven's lawsuit " 'arises from' [Anders's] exercise of free speech or petition rights as defined in CCP Section 425.16(e)." Because the court did not find that Anders satisfied his initial burden, it did not consider whether there is a probability that Ocean's Eleven will prevail on the merits. In addition, the court did not rule on the parties' respective objections to evidence.

Anders timely appealed.

## DISCUSSION

### I

### *BURDEN OF PROOF AND STANDARD OF REVIEW*

A special motion to strike under section 425.16 allows a defendant to gain early dismissal of a lawsuit that qualifies as a SLAPP. (§ 425.16, subd. (a).) A two-step analysis is required when the superior court is requested to rule on a special motion to strike under the anti-SLAPP statutory framework. (*Equilon Enterprises, LLC v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) The court is first to determine if the lawsuit falls within the scope of the statute, as arising from protected activity (generally, petitioning or free speech). (*Ibid*.; § 425.16, subd. (b)(1).) The

11

defendant bears the burden of demonstrating that a cause of action in the lawsuit is one "arising from" protected activity. (*Ibid.*)

The second prong of the statute deals with whether the plaintiff has "demonstrated a probability of prevailing on the claim." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) Under section 425.16, subdivision (b)(2), the superior court in making these determinations considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (*Ibid.*) For purposes of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . ." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) A plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)

We review de novo the trial court's rulings on an anti-SLAPP motion. (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645.)

## II

### *WHETHER THE LAWSUIT FALLS WITHIN THE SCOPE OF THE STATUTE*

Ocean's Eleven argues its suit does not fall within the scope of the anti-SLAPP statute because the case is about theft. According to Ocean's Eleven, Anders stole Ocean's Eleven's confidential information and posted it on the Internet. In addition, Ocean's Eleven contends Anders used its trade name and trademarks without permission.

12

Ocean's Eleven insists "the very nature of the conversion, misappropriation, and trespass claims confirm that they are all about theft and not speech." We are not persuaded. Both the complaint and the record in this matter underscore that the focus of Ocean's Eleven's action against Anders is his website activity. The allegations of theft aimed at Anders are based on the actions of Chaney and a supposed conspiracy between Anders and Chaney.

"We look for 'the principal thrust or gravamen of the plaintiff's cause of action.' [Citation.] We 'do not evaluate the first prong on an anti-SLAPP test solely through the lens of a plaintiff's cause of action.' [Citation.] The 'critical consideration' is what the cause of action is 'based on.' [Citation.]" (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 465 (*Hecimovich*); italics omitted.) Ocean's Eleven frames its causes of action as centering on Anders's theft and argues that Anders cannot turn this case into one about free speech simply by posting the ill gotten gains of his thievery on his website. He has not. Instead, it is clear from Ocean's Eleven's own allegations in its complaint that every cause of action involves, in some way, Anders's website and what he and others posted there. Although there are allegations that Anders conspired with Chaney in some way to steal Ocean's Eleven's confidential information, the focus of the allegations against Anders involve statements he made on his website. And all causes of action are aimed at shutting down Anders's website and his efforts to encourage others to post on it. The first two causes of action (trade disparagement and intentional interference with economic relationships) are clearly based on Anders's statements on his website. The claims for trademark infringement and violation of ACPA involve the use of Ocean's Eleven's trademarks and logos on Anders's website. Ocean's

13

Eleven's causes of action for conversion and misappropriation of trade secrets ostensibly involve the theft of confidential information, but, based on our review of the record and the respondent's brief, these claims appear to arise out of Anders allegedly posting this information on his website: "Anders . . . took stolen confidential information from [Ocean's Eleven] and posted it on the Internet." The claim of trespass involves allegations that Anders's agents distributed flyers at Ocean's Eleven's casino encouraging people to post comments on Anders's website. The preliminary and permanent injunctive remedy is aimed at Anders's posting on his website. All these causes of action share a common thread: they arise from Anders's website activity or seek to curtail Anders's website activity. Further, it is apparent that Ocean's Eleven only filed suit when Anders refused to stop posting on his website. In regard to Anders, this case is not about theft. It is about Anders's website and what he and others have posted on it.

Having determined that this case is not primarily about theft, we next turn to Anders's contention that Ocean's Eleven's claims fall under section 425.16, subdivision (e)(3). That subdivision defines " 'an act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " as "any written or oral statement or writing made in a place open to the public or a public forum in connection win an issue of public interest[.]" (*Ibid.*) Anders maintains that his posts were made in a public forum about an issue of public interest. Ocean's Eleven's disagrees, arguing Anders's posts do not concern an issue of public interest.

As a threshold matter, Ocean's Eleven does not contest that Anders's posts occurred in a public forum. Nor could it convincingly do so. "In a sense, the Web, as a

14

whole, can be analogized to a public bulletin board. . . . It is public because it posts statements that can be read by anyone who is interested, and because others who choose to do so, can post a message through the same medium that interested persons can read." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897 (*Wilbanks*).) As this court recently stated: "[W]e view the Internet as an electronic bulletin board open to literally billions of people all over the world. [Citation.] The Internet is a classic public forum which permits an exchange of views in public about everything from the great issues of war, peace, and economic development to the relative quality of the chicken pot pies served at competing family restaurants in a single small neighborhood." (*Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146 (*Chaker*).) Here, it is clear that Anders's website was a public forum. He could post his comments on it, any interested person could read his comments, and others were able to post their comments.

Next, we must determine whether Anders's posts were made "in connection with an issue of public interest[.]" (§ 425.16, subd. (e)(3).) "Section 425.16 does not define 'public interest' " but courts have construed the phrase " 'broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' [Citation.]" (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 693, 695 (*Summit Bank*) [noting the "exceedingly 'expansive interpretation of the phrase "issue of public interest" ' "].) In this vein, several courts have defined an "issue of public interest" as " ' "any issue in which the public is interested." ' " (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 465, quoting *Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 716.)

15

In addition, courts considering this issue "have emphasized that the public interest may extend to statements about conduct between private individuals." (*Chaker*, *supra*, 209 Cal.App.4th at p. 1145.) Although not every website post " 'involves a public issue' [citation] consumer information that goes beyond a particular interaction between the parties and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest for purposes of the anti-SLAPP statute." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366 (*Wong*).) Other courts have applied the following test to determine whether an issue is of public interest: " '[a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest.' " (*D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1215, quoting *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814.)

Applying these principles, several cases have concluded consumer information posted on a website concerns an issue of public interest. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23 [patient's statements about a plastic surgeon were of public interest under section 425.16 because they provided information that would be material to potential consumers "contemplating plastic surgery"]; *Wilbanks*, *supra*, 121 Cal.App.4th at p. 898 ["[c]onsumer information" posted on the Internet "at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest"]; *Wong*, *supra*, 189 Cal.App.4th at pp. 1366-1367 [review on Yelp criticizing dental services and discussing use of silver amalgam raised issues of public interest].)

16

Our recent opinion in *Chaker*, *supra*, 209 Cal.App.4th 1138 is instructive. There, the defendant posted derogatory comments about the plaintiff and his forensics business on the website "Ripoff Report." (*Id*. at p. 1146.) The defendant's statements included " 'You should be scared. This guy is a criminal and a deadbeat dad. . . .' 'I would be very careful dealing with this guy. He uses people, is into illegal activities, etc. I wouldn't let him into my house if I wanted to keep my possessions or my sanity.' " (*Id*. at p. 1142.) The defendant also accused the plaintiff of picking up streetwalkers and homeless drug addicts. (*Ibid*.) We had "little difficulty finding the statements were of public interest. The statements posted to the Ripoff Report [website] about Chaker's character and business practices plainly fall within the rubric of consumer information about Chaker's 'Counterforensics' business and were intended to serve as a warning to consumers about his trustworthiness." (*Id*. at p. 1146.)

The same is true here. Anders created his website to discuss Ocean's Eleven, specifically his ban from the casino, Kelegian's management of the casino, the decline of Ocean's Eleven, and Ocean's Eleven's treatment of its employees. As Anders states in his declaration, he "decided to give a voice to the employees and customers of Ocean's Eleven" so he "built a website where employees and customers could post their comments anonymously." In other words, Anders created a website allowing people to post consumer information about Ocean's Eleven.

Ocean's Eleven insists Anders's website is only a vehicle to "air his personal grievances after he was banned from Ocean's Eleven for his own misconduct." We disagree. Moreover, Ocean's Eleven's argument ignores the allegations in its complaint

17

wherein it alleged Anders made "false statements regarding Ocean's Eleven, including but not limited to statements that Ocean' s Eleven, and its management have committed unlawful and illegal business practices."  Thus, Ocean's Eleven's own allegations buttress the claim that Anders's allegedly disparaging statements go beyond his perceived personal ill treatment and address Ocean's Eleven's general business practices, especially its management of the casino.  Based on our review of the record, we find support for these allegations.

Although Anders has discussed his view of what happened to him as well as the status of his litigation with Ocean's Eleven, others have commented about Ocean's Eleven's recent changes and how they have impacted their enjoyment of the establishment.  Indeed, Anders has encouraged individuals to post their opinions about Ocean's Eleven.  Based on the numerous comments on Anders's website, it is apparent they have.  These comments include colorful attacks of Kelegian's management style, disappointment regarding the decline of Ocean's Eleven, and other possible places to frequent.  There exist positive comments in support of Kelegian and the changes at Ocean's Eleven.  There are even comments about chicken wings served at Ocean's Eleven and the removal of downstairs bathrooms.  Simply put, Anders's website is not only a medium to allow him to post his individual grievances about Ocean's Eleven; it provides a public forum to allow patrons and employees of Ocean's Eleven as well as the public at large to post their opinions about Ocean's Eleven.  As set forth in its complaint, Ocean's Eleven takes issue with these comments because it claims they defame "its trade and allege criminal contact on its part."  As such, Ocean's Eleven's own allegations make

18

clear that the type of comments it found objectionable and attempted to stymie through its complaint are analogous to those we found to be concerning a public interest in *Chaker*, *supra*, 209 Cal.App.4th at pages 1142 and 1146.

Ocean's Eleven also argues that Anders has not shown that the information on Anders's website affects a large number of people; thus, it should not be considered information concerning a public interest. (See *Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.) To this end, Ocean's Eleven points out that it is a privately held partnership that owns a single casino in Oceanside, California. In addition, Ocean's Eleven emphasizes that it does not have the potential to affect the fortune of thousands of shareholders or the market as a whole. There is no requirement, however, that a company be a certain size to satisfy the public interest requirement under the anti-SLAPP statute. In fact, we recently noted that case law has "emphasized that the public interest may extend to statements about conduct between private individuals." (*Chaker*, *supra*, 209 Cal.App.4th at p. 1145.)

Further, the allegations in Ocean's Eleven's complaint again belie its argument. Ocean's Eleven alleged it "is one of Southern California's most well-known and respected cardrooms and casinos. In operation since 1997, Ocean's Eleven is a major contributor to San Diego County's economy by employing hundreds of local residents." Certainly a casino with this reputation that is a "major contributor to San Diego County's economy" would affect a sufficient number of people to qualify as an issue of public interest.

Ocean's Eleven also maintains that this case is analogous to both *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561 (*World*

19

*Financial Group*) and *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90 (*Mann*). We disagree.

In *World Financial Group*, the plaintiff sued a business competitor and its agents for misappropriating trade secrets and utilizing confidential information to solicit the plaintiff's associates and customers. (*World Financial Group*, *supra*, 172 Cal.App.4th at pp. 1564-1566.) The defendants moved to dismiss the complaint under the anti-SLAPP statute, and the trial court found the claims were not subject to the statute. (*Id*. at pp. 1566-1567.) In affirming, the appellate court rejected the defendants' argument that the issue concerned one of public interest because the allegedly wrongful communications pertained to " 'the pursuit of lawful employment' " and to " 'workforce mobility and free competition.' " (*Id*. at p. 1569.) The court explained that in evaluating the first prong of the anti-SLAPP statute, a court must focus on the " 'specific nature of the speech rather than the generalities that might be abstracted from it.' " (*Id*. at p. 1570, italics omitted.) Applying this principle, the court found defendants' communications were not " 'about' these broad [social] topics, nor were they designed to inform the public of an issue of public interest." (*Id*. at p. 1572.) Instead, the court found they "were merely solicitations of a competitor's employees and customers undertaken for the sole purpose of furthering a business interest." (*Ibid*.) The court emphasized that the challenged statements did not concern an issue of public interest because they were merely "part of a competitor's pitch to [the plaintiff's] associates" and were "motivated solely by the competitor's desire to increase its sales ranks." (*Id*. at p. 1573.)

20

Here, there is no analogous conduct on behalf of Anders. He is not soliciting Ocean's Eleven's employees and customers to further his own business interest. Instead, he provided a forum for those people to discuss Ocean's Eleven. Although there are allegations that Anders solicited donations to fund his legal defense, such a request is very different from a former employee attempting to solicit his former employer's employees and customers for the benefit of a competing business. Moreover, Anders's solicitation of donations for his legal defense only became necessary after Ocean's Eleven sued him because of his website. *World Financial Group*, *supra*, 172 Cal.App.4th 1561, is not instructive here.

Similarly, *Mann*, *supra,* 120 Cal.App.4th 90 is of no help to Ocean's Eleven. That case concerns comments the defendants made to plaintiff's customers as well as the defendants reporting the plaintiff to the National Response Center and the National Terrorist Hotline. (*Id*. at pp. 100-101.) Like *World Financial Group*, *supra*, 172 Cal.App.4th 1561, *Mann* concerns statements and actions made by a competing business seeking a competitive advantage. No such analogous facts exist here.

In summary, despite Ocean's Eleven's attempt to frame their case against Anders as one revolving around theft of confidential information, the instant matter focuses on Anders's website activity. Anders's website provides a forum for the public to discuss Ocean's Eleven, a "well known and respected" casino in Southern California that is a "major contributor to San Diego County's economy." In this respect, Ocean's Eleven's complaint is a classic SLAPP suit, filed by an entity to suppress public debate.

21

## III

### *PROBABILITY OF SUCCESS ON THE MERITS*

Because we determine Anders has shown the complaint arises out of protected activity, the burden shifts to Ocean's Eleven to demonstrate a probability that it would prevail on claims against Anders. (§ 425.16, subd. (b)(2); *Navellier*, *supra*, 29 Cal.4th at p. 89; *Equilon*, *supra*, 29 Cal.4th at p. 58.) " '[T]he plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citations.]" (*Navellier*, *supra*, at pp. 88-89.) Here, because the superior court found, however erroneously, that Ocean's Eleven's lawsuit was not within the anti-SLAPP statute, it did not reach this step. Nevertheless, we can decide the issue. (*Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 615-616.) Further, the parties extensively briefed this topic; therefore, we will analyze whether Ocean's Eleven has satisfied its burden.

To satisfy the second prong of the anti-SLAPP analysis, " ' "the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" [Citation.]' [Citation.] 'Thus, plaintiffs' burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment.' [Citation.] If the plaintiff fails to carry that burden, the cause of action is 'subject to being stricken under the statute.' [Citation.]" (*Feldman v. 1100 Park*

*Lane Associates* (2008) 160 Cal.App.4th 1467, 1477-1478; accord, *Delois v. Barrett Block Partners* (2009) 177 Cal.App.4th 940, 946-947.)

In determining whether plaintiffs will probably prevail on the merits, we consider the pleadings and evidentiary submissions on both sides, but we do not weigh credibility or comparative strength of the evidence. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906.) Yet, a plaintiff can only sustain its burden with admissible evidence. (See *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 108; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017 ["The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence."].)[4]

A. Trade Disparagement and Intentional Interference with Economic Relationships

Although Ocean's Eleven names its first cause of action trade disparagement, it couches this claim as one for trade libel in its brief. To establish liability for trade libel, a plaintiff must prove the following elements: (1) the defendant published a statement; (2) the statement tended to disparage the plaintiff's product or property; (3) the statement was provably false; (4) the defendant acted with knowledge that the statement was false or with reckless disregard for its falsity; and (5) the statement caused specific pecuniary damage to the plaintiff. (See 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 645, pp. 951-952; *Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1360-1361.)

---

4       The superior court did not rule on either party's objections to evidence. To the extent necessary, we shall address a party's objection to evidence we consider in this opinion.

23

Ocean's Eleven's trade libel claim relies on three comments:

"If poker dealers talk about how they feel to a customer, [Kelegian] has said they will be fired.

"A short time after [Kelegian] saw a copy of that letter [to Lack], [Kelegian] had [Anders] banned from Ocean's Eleven.

"As you know [Kelegian] had me banned from Ocean's Eleven, my crime?  Being concerned about the treatment of employees."

Here, the preliminary question we face is whether Anders's statements may be considered statements of fact or opinion.  In doing so, we recognize "[t]he critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law."  (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601.)  In determining whether an opinion is actionable, we must look at the totality of the circumstances that gave rise to the statements and in particular the context in which the statements were made.  (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 389 (*Franklin* ).)  " 'This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.' "  (*Ibid.*)

In determining statements are nonactionable opinions, a number of recent cases have relied heavily on the fact that statements were made in Internet forums.  (See e.g., *Summit Bank, supra,* 206 Cal.App.4th at pp. 696-701; *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1162 (*Krinsky*).  With respect to statements posted in a section of the Craigslist website entitled "Rants and Raves," the court in *Summit Bank* determined that a reader "should be predisposed to view them with a certain amount of skepticism, and

24

with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts. '[A]ny reader familiar with the culture of . . . most electronic bulletin boards . . . would know that board culture encourages discussion participants to play fast and loose with facts. . . . Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly.' [Citations.]" (*Summit Bank*, *supra*, 206 Cal.App.4th at pp. 696-697, fn. omitted.)

In *Summit Bank*, the defendant posted a series of derogatory statements about the plaintiff bank: "(1) The Bank didn't pay dividends in 2009; (2) the 'bitch CEO' who runs the Bank 'thinks that the Bank is her personel [sic ] Bank to do with as she pleases'; (3) the CEO should not be allowed to provide an executive position to her 'worthless, lazy fat ass son'; (4) depositors should move their accounts immediately, 'before its [sic] too late'; (5) the Bank is 'screwed up,' 'piss poor,' and a 'problem Bank'; (6) the Federal Deposit Insurance Corporation (FDIC) and the California Department of Financial Institutions have 'look[ed] at Summit Bank' three times in less than one year and that is 'not a good thing'; (7) service was poor at the Bank's Hayward branch and the Bank closed it; (8) after the Hayward branch was closed, the customers 'were left high and dry'; and (9) the Bank's depositors should leave 'before they close.' " (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 697.)

The plaintiff bank in *Summit Bank* alleged the statements taken together, and in particular the statement the CEO used the bank as her personal bank and the plaintiff was a "problem bank," suggested the CEO was misappropriating money and the bank was on the verge of insolvency. In finding the defendant's statements were nonactionable

25

opinions, the court relied in part on the fact they were posted on the "Rants and Raves" website and lacked " 'the formality and polish typically found in documents in which a reader would expect to find facts.' " (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 699.)

In *Krinsky*, the court found the following statements, made on an Internet blog, were hyperbolic opinions:  " '[F]unny and rather sad that the losers who post here are supporting a management consisting of boobs, losers and crooks.  (Krinsky, Natan and Seifer) while criticizing a charitable and successful hedge fund manager, who, unlike his critics and the longs here, has done his homework.  [¶]  How many of the idiot longs here did their work and said to themselves, "I know Natan had been CFO of at least 3 bankrupt companies and I know Seifer filed for personal bankruptcy and roughed up some patients, shares a rolls royce and a bently [sic ] with the President and a $15mm [sic] mansion, but what the hey, the numbers look good and it has been a long time."  [¶] No, Loeb earned his $$$ and those of you who are whimpering on eachother's [sic ] shoulders crying to be saved by Spizer, the SEC etc are a bunch of pathetic losers. . . . But we already knew that, you were long SFCC.  [¶]  Ole!' " (*Krinsky*, *supra*, 159 Cal.App.4th at p. 1176.)  Like the court in *Summit Bank*, the court in *Krinsky* relied in large part on the fact the statements were made on an Internet message board where heated discussions about the plaintiff were taking place. (*Krinsky, supra,* at pp. 1175, 1177-1178.)

We recently followed both *Summit Bank, supra,* 206 Cal.App.4th 669 and *Krinsky, supra,* 159 Cal.App.4th 1154 in determining certain comments on the Internet were opinions:

"As we have noted, the statements about Chaker were made in the context of the paternity and child support litigation going on between Chaker and [the defendant's] daughter and all were made on Internet [websites] which plainly invited the sort of exaggerated and insulting criticisms of businesses and individuals which occurred here. The overall thrust of the comments attributed is that Chaker is a dishonest and scary person. This overall appraisal of Chaker is on its face nothing more than a negative, but nonactionable opinion.

"In this context it is difficult to conclude [the defendant's] alleged embellishments, to the effect Chaker picks up street walkers and homeless drug addicts and is a deadbeat dad, would be interpreted by the average Internet reader as anything more than the insulting name calling-in the vein of 'she hires worthless relatives,' 'he roughed up patients' or 'he's a crook'-which one would expect from someone who had an unpleasant personal or business experience with Chaker and was angry with him rather than as any provable statement of fact. In this regard, we note the insults are generalized in that they lack any specificity as to the time or place of Chaker's supposed behavior; the absence of such specificity is yet a further signal to the reader there is no factual basis for the accusations. Thus, we are unable to distinguish these insults from the nonactionable ones posted in *Summit Bank* and *Krinsky*, and like the courts in those cases, we conclude these statements are nonactionable opinions." (*Chaker*, *supra*, 209 Cal.App.4th at pp. 1149-1150.)

Here, we find *Chaker, supra*, 209 Cal.App.4th 1138, *Summit Bank, supra,* 206 Cal.App.4th 669, and *Krinsky, supra,* 159 Cal.App.4th 1154 analogous to the instant matter. Anders created his website and made his comments on it after being banned from Ocean's Eleven. His comments aim at the change in management of Ocean's Eleven and what he believes are Kelegian's poor management skills. As such, he is telling the public of the ills he perceives plague Ocean's Eleven and encouraging others to share their opinions as well. The overall focus of Anders's comments is that Ocean's Eleven is a bad place to frequent.

27

Further, the nature of the website causes the reader to question the veracity of the comments. On the website, Anders identifies himself as "just a pretend doctor" and "all around silly guy." He includes the message "SPEAK UP!" He encourages others to post their "opinions" with such inspirational sayings as Harvey Fierstein's "Never be bullied into silence. Never allow yourself to be made a victim. Accept no one's definition of yourself; define yourself." And the website even includes another inspirational statement: "Strong people stand up for themselves stronger people stand up for others" next to a picture of a cat holding up another cat as it climbs a fence.

Further, the comments on the website are full of typographical errors and colorful language. One commenter even thanked Anders for providing a place to "vent." Considering this context, we struggle to see how any reader would believe that Anders or any of the commenters were making factual statements. Anders's website is an avenue for the public to post their experiences with and opinions of Ocean's Eleven. In this way, it is similar to the websites at issue in *Chaker*, *Summit Bank*, *supra,* 206 Cal.App.4th 669 and *Krinsky, supra,* 159 Cal.App.4th 1154. Simply put, we find no difference in Anders's comments and the comments we found nonactionable opinion in *Chaker*, *supra*, 209 Cal.App.4th at pages 1149 and 1150.

In addition, even if we were to determine that Anders's comments were factual statements that were capable of being proven false, Ocean's Eleven has failed to satisfy its burden for the additional reason that it did not show any of Anders's statements caused it specific pecuniary damage. The only evidence Ocean's Eleven offers to show it suffered pecuniary damage are two comments from Anders's website:

28

"Oceans 11 needs colorful characters like Tim. It's an outrage he's banned simply for writing a letter expressing his view. Time to start playing at the Indian card rooms.

"Wow, since hearing rumor of this unjust banning of a VIP Parton I have not been back to that casino. We need to do something about this manager who feels he can just ban such a well liked person as Tim Anders. So I well [sic] do my part and avoid going back into the Oceans 11 until this patron is allowed back in the casino."

Ocean's Eleven contends these comments prove it actually lost business.

However, Ocean's Eleven overlooks the requirement that it must prove a probability of success on the merits with "competent admissible evidence." (*Paiva v. Nichols*, *supra*, 168 Cal.App.4th at p. 1017.) Ocean's Eleven is offering the two comments from Anders's website for the truth of the matters they assert, namely the commenters no longer are going to Ocean's Eleven. The identity of the commenters is unknown. These comments are out-of-court statements. They are hornbook examples of hearsay and thus not admissible.[5] (Evid. Code, §1200.) As Ocean's Eleven does not offer any admissible evidence showing it suffered any pecuniary damage from Anders's statements, its trade disparagement claim fails for this reason as well.

---

[5] Even if we were to admit the two comments and accept the statements as true, they do not establish that Ocean's Eleven suffered any pecuniary damage. Ocean's Eleven does not show that it lost any money because the two commenters ceased patronizing Ocean's Eleven.

Ocean's Eleven contends it will prevail on its claim for intentional interference with economic relationships[6] based on the same evidence that establishes its trade disparagement claim. The elements of this cause of action are: " ' " '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [or negligent] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.' [Citations.]" [Citation.]' [Citation.]" (*Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 596.) Here, the acts on which it bases this claim are Anders's website activities. Thus, for the same reasons Ocean's Eleven's trade disparagement claim fails, so too does its claim for intentional interference with economic relationships.

## B. Trademark Infringement

Ocean's Eleven's third cause of action against Anders is trademark infringement. To prove a claim of trademark infringement, a plaintiff must show: (1) it has valid trademark rights; and (2) the defendant's use of a similar mark is likely to cause confusion. (*Applied Info. Science Corp. v. eBay, Inc.* (9th Cir. 2007) 511 F.3d 966, 969.) "Infringement claims are subject to a commercial use requirement." (*Bosely Medical Institute, Inc. v. Kremer* (9th Cir. 2005) 403 F.3d 672, 676 (*Bosely*).) Therefore, in

---

6    Although Ocean's Eleven names its second cause of action intentional interference with economic relationships, it is more commonly called intentional interference with prospective economic advantage.

addition to the first two elements, to prove a claim for trademark infringement, a plaintiff must show the use of the actual mark or a similar mark was " 'in connection with a sale of goods or services.' " (*Id*. at p. 677.)

Here, Ocean's Eleven has shown that it owned the mark "Ocean's Eleven Casino." Anders does not dispute this. Ocean's Eleven then contends that Anders is liable for trademark infringement because (1) he used Ocean's Eleven's trademark on his website and (2) www.oceans11.info as a domain name is too similar to Ocean's Eleven's trademark.

Initially, we note that Ocean's Eleven's attempts to show it will prevail on its trademark infringement claim are fairly superficial. Ocean's Eleven does not sufficiently address the elements of this cause of action nor does it clearly show where each element is proved by citation to the record. Indeed, one of the cases Ocean's Eleven cites in its respondent's brief (*Bosely*, *supra*, 403 F.3d 672)[7] is directly on point in favor of Anders, but Ocean's Eleven does not attempt to distinguish it.

---

[7] Ocean's Eleven cites *Bosely*, *supra*, 403 F.3d 672 for the proposition that an anti-SLAPP motion cannot apply to a trademark infringement claim. The holding in *Bosely*, however, is not so broad. The court found: "An infringement lawsuit by a trademark owner over a defendant's unauthorized use of the mark as his domain name does not *necessarily* impair the defendant's free speech rights." (*Id*. at p. 682; italics in original.) There, when the defendant brought his anti-SLAPP motion, it was aimed only at the trademark infringement and violation of ACPA claims. (*Id*. at pp. 675, 680.) The libel claim had been settled. In contrast, Ocean's Eleven's first two causes of action for trade disparagement and intentional interference with economic relationships are directed at Anders's website postings and we find that all of Ocean's Eleven's claims against Anders arise out of Anders's use of his website to criticize Ocean's Eleven.

Anders admitted he used Ocean's Eleven's mark on his website without permission. He also stated that he removed the mark after receiving a letter from Ocean's Eleven's counsel demanding that he do so. There is no evidence in the record showing how long Anders used Ocean's Eleven's mark. In addition, Ocean's Eleven offers no evidence that Anders used the trademark in connection with the sale of goods or services. (See *Bosely*, *supra*, 403 F.3d at p. 677.) Instead, it appears from the record that Anders used the Ocean's Eleven trademark on his website to help identify Ocean's Eleven as the subject of his website. As such, Anders admitted use of Ocean's Eleven's trademark does not constitute trademark infringement.

With scant explanation, Ocean's Eleven next asserts Anders use of www.oceans11.info is "confusingly similar to Ocean's Eleven's mark."[8] Ocean's Eleven, however, does not address *Bosely*, *supra*, 403 F.3d 672, which involves the same issue. There, the defendant was dissatisfied with the hair restoration services provided him by Bosely Medical Institute, Inc. (Bosely Medical). The defendant started a website at

---

[8]    Ocean's Eleven's argument that the domain name www.oceans11.info is confusingly similar to its mark is especially glib. "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." (*E. & J. Gallo Winery v. Gallo Cattle Co.* (9th Cir. 1992) 967 F.2d 1280, 1290.) Courts look to the following nonexclusive factors, known as the *Sleekcraft* test, for guidance in determining the likelihood of confusion: (1) strength of the plaintiff's mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and the (8) likelihood of expansion of the product lines. (*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.* (9th Cir. 1997) 109 F.3d 1394, 1404, citing *AMF, Inc. v. Sleekcraft Boats* (9th Cir. 1979) 599 F.2d 341, 348-349.) Ocean's Eleven fails to mention the *Sleekcraft* test, but merely concludes the domain is confusingly similar with little analysis.

www.BosleyMedical.com, which was "uncomplimentary of" Bosley Medical. (*Id*. at p. 674.) Bosely Medical sued the defendant for, among other things, trademark infringement. The Ninth Circuit determined the trademark infringement claim lacked merit because the defendant's use of the website was noncommercial. (*Id*. at pp. 677-680.) The court noted that the defendant's "use of the Bosley Medical mark simply cannot mislead a consumer into buying a competing product-no customer will mistakenly purchase a hair replacement service from [the defendant] under the belief that the service is being offered by Bosley [Medical]." (*Id.* at pp. 679-680.)

Here, Anders's use of the www.oceans11.info domain name for his website is the same as the defendant's use of www. BoselyMedical.com in *Bosely*, *supra*, 403 F.3d 672. Both use the respective websites to criticize a company of which they take issue with its product or service. Anders is not capitalizing on the good will Ocean's Eleven has created in its mark. He is not using the mark to sell a competing product. Any harm that Ocean's Eleven may have experienced arises not from a competitor's sale of a similar product under Ocean's Eleven's mark, but from Anders's criticism of Ocean's Eleven. (See *Bosely*, *supra*, 403 F.3d at p. 680; see also *Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research* (10th Cir. 2008) 527 F.3d 1045, 1052-1054 (*Utah Lighthouse*).)

Nevertheless, Ocean's Eleven contends it is "undisputed that Anders used the mark for a commercial purpose." To this end, Ocean's Eleven argues Anders used the mark to solicit monetary contributions to pay for his litigation with Ocean's Eleven and as a "marketing tool" for his children's book business, apparently with links to another

33

website where children's books could be ordered. Ocean's Eleven, however, does not cite to any evidence in the record to support its argument. Our review of the record has uncovered no admissible evidence on point either. For this reason alone, Ocean's Eleven has failed to carry its burden.

In addition, even if Ocean's Eleven had admissible evidence to support its position, we would still determine its trademark infringement claim fails. The court in *Bosley*, *supra*, 403 F.3d 672 addressed a similar argument by Bosely Medical and found it unavailing. We agree with the Ninth Circuit in *Bosley* and its reasoning and apply it to Ocean's Eleven's argument regarding any potential links on Anders's www.oceans11.info website to other websites where his books could be purchased or people could donate to Anders's litigation fund. Anders is not employing his website www.oceans11.info to offer competing products using Ocean's Eleven's mark. The links to the other websites where Anders is selling his books or his request for contributions to his litigation fund is too tenuously related to the allegedly infringing domain name and the services and/or products Ocean's Eleven offers its customers. Ocean's Eleven therefore has failed to show a probability of prevailing on the merits for its trademark infringement claim. (See *Bosely*, *supra*, at p. 680; *Utah Lighthouse*, *supra*, 527 F.3d at p. 1054.)

Lastly, Ocean's Eleven argues that the merit of its trademark claim already has been decided in its favor because the superior court issued a preliminary injunction preventing Anders from using "Oceans 11 or Oceans Eleven" in connection with any website, including www.oceans11.info. This preliminary injunction order issued after the superior court ruled on Anders's anti-SLAPP motion. It has no bearing on the question

34

before us.  Further, the evidence and pleadings relied upon by the court to order the injunction are not in the record.  Also, absent additional evidence, we do not see how Ocean's Eleven can distinguish this case from *Bosely*, *supra*, 403 F.3d 672 in regard to the trademark infringement claim.

### C.  Violation of ACPA

Ocean's Eleven's fourth claim against Anders is for violation of ACPA.  An individual may be held liable under ACPA for cybersquatting if the person (1) registers, traffics in, or uses a domain name identical or confusingly similar to a distinctive mark, and (2) has a bad faith intent to profit from use of the mark as a domain name.  (See 15 U.S.C. § 1125(d); *Bosley*, *supra*, 403 F.3d at p. 680; *Utah Lighthouse*, *supra*, 527 F.3d at p. 1057.)  Here, we focus on the second element (a bad faith intent to profit).

Ocean's Eleven insists that it has shown that Anders's used "Ocean's Eleven's mark to make money for himself."  Again, like its claim for trademark infringement, Ocean's Eleven neglects to cite to the record to support its assertion.  Further, Ocean's Eleven does not address any of the various factors ACPA sets out to be considered when evaluating the bad faith intent to profit of a domain name registrant.[9]  (See 15 U.S.C.

---

[9]    The factors include (1) the registrant's trademark rights in the domain; (2) legal name rights in the domain; (3) the registrant's prior use of the domain; (4) the registrant's bona fide noncommercial or fair use of the domain; (5) the registrant's improper intent to divert customers and tarnish or disparage the mark of another; (6) the registrant's offer to transfer, sell, or assign; (7) whether the registrant provided misleading contact information when applying for registration; (8) the registrant's acquisition of multiple domain names confusingly similar to the marks of others; and (9) the extent to which the trademark incorporated in the registrant's domain name is distinctive and famous. (15 U.S.C. § 1125(d)(1)(B)(i).)

35

§ 1125(d)(1)(B)(ii); *Utah Lighthouse*, *supra*, 527 F.3d at p. 1058.)  In fact, Ocean's Eleven seems to ignore the bad faith intent requirement altogether.

For example, "[t]he quintessential example of a bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price.  A defendant could also intend to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." (*Utah Lighthouse*, *supra,* 527 F.3d at p. 1058.)  Neither of these purposes is evident here.  Moreover, Ocean's Eleven has not provided any admissible evidence or argument showing Anders's bad intent.  This lack of showing defeats Ocean's Eleven's claim for violation of ACPA.  Accordingly, Ocean's Eleven has not shown the probability that it will prevail on the merits of this claim.

### D.  Conversion

Ocean's Eleven's fifth cause of action is conversion.  " 'Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion claim are:  (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.' "  (*Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal.App.4th 1383, 1387.)

Here, Ocean's Eleven's maintains that it is "beyond dispute that Anders received stolen documents and information that belongs to Ocean's Eleven."  It is not clear from the respondent's brief on what admissible evidence Ocean's Eleven bases this argument.

36

In its complaint, Ocean's Eleven alleges Anders and Chaney conspired to steal confidential company memoranda and other confidential company information. However, Ocean's Eleven has provided no evidence to support this allegation. At best, Ocean's Eleven has offered evidence that Anders admitted to having the same memoranda that Chaney stole. Yet, Ocean's Eleven does not offer any evidence regarding how Anders received this information. Anders, on the other hand, stated in his declaration that he did not receive any memoranda from Chaney. The only explanation in the record is that Anders received memoranda and information directly from Ocean's Eleven employees. Simply put, Ocean's Eleven has no evidence that Chaney provided Anders with the confidential memoranda or any other confidential information that is at the heart of Ocean's Eleven's conversion claim.

In addition, Ocean's Eleven has offered no evidence that it has been damaged. It merely asserts that Anders's possession of the confidential information deprives Ocean's Eleven's use of it. Ocean's Eleven fails to explain why this is so. It does not appear that Anders possesses the only copies of the memoranda. And Ocean's Eleven does not clarify how Anders's possession of the memoranda prevents Ocean's Eleven's use of the information contained in the memoranda.

In his declaration, Kelegian states that Anders posted a confidential memorandum on a website called www.helpfreespeech.com. Anders objects to Kelegian's statement, claiming it lacks foundation, is irrelevant, and comprises hearsay. This objection is well taken. Kelegian fails to explain how he knows Anders posted the confidential information. Moreover, there is no screenshot of www.helpfreespeech.com or a copy of

37

the confidential memorandum in the record. Kelegian's testimony about the contents of www.helpfreespeech.com and the memorandum is hearsay (see Evid. Code, § 1200) and runs afoul of the rule that "oral testimony is not admissible to prove the content of a writing." (Evid. Code, § 1523, subd. (a).)

Not only is there no admissible evidence in the record that Anders posted any confidential information on a website, the allegedly confidential memoranda are not found anywhere in the record. Instead, in Kelegian's declaration, he describes the content of some of these memoranda as comprising Ocean's Eleven's policies and procedures, including "specific gaming and money handling procedures and counterfeit bills."[10] Kelegian also claims that Anders can use the information to "cheat the casino." Again, however, Ocean's Eleven fails to provide any evidence that Anders has used the information in any way. Moreover, because Ocean's Eleven banned Anders from its casino, it is unclear how Anders could use the confidential information to "cheat the casino." And there is no evidence that Anders has shared the contents of the confidential information with any third party.

Ocean's Eleven has failed to show a probability that it will prevail on its conversion claim.

---

[10] Anders objected to Kelegian's declaration describing the content of the confidential memoranda. We sustain this objection for the same reasons we disregard Kelegian's testimony regarding the confidential memorandum Anders allegedly posted on the website www.helpfreespeech.com. (See Evid. Code, §§ 1200, 1523, subd. (a).)

E. Misappropriation of Trade Secrets

Ocean's Eleven's sixth cause of action against Anders is for misappropriation of trade secrets. A prima facie claim for misappropriation of trade secrets "requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665.) Here, Ocean's Eleven contends that it provided evidence of this claim because Anders "misappropriated, used, and disclosed its trade secrets[,]" namely the confidential memoranda. We disagree.

As we discuss in the context of Ocean's Eleven's conversion claim, Ocean's Eleven does not offer any admissible evidence regarding the content of the alleged confidential memorandum. Without admissible evidence of the content of the confidential memoranda, Ocean's Eleven cannot establish the existence of any trade secret.[11]

In addition, Ocean's Eleven has not offered any admissible evidence that Anders acquired, disclosed, or misappropriated any trade secret nor has it shown that it has been damaged. Therefore, Ocean's Eleven has not shown the probability that it will prevail on the merits of its misappropriation of trade secrets claim.

---

[11] In its opposition to Anders's anti-SLAPP motion, Ocean's Eleven offered to provide the confidential memoranda to the superior court in camera. There is no indication in the record that it did so. Additionally, it did not attempt to augment the record with the memoranda here. Because Ocean's Eleven has the burden to prove the probability it will prevail on its misappropriation of trade secrets claim, it must show that an actual trade secret exists. (See *Sargent Fletcher, Inc. v. Able Corp.*, *supra*, 110 Cal.App.4th at p. 1665.) It did not do so with admissible evidence. (See *McGarry v. University of San Diego*, *supra*, 154 Cal.App.4th at p. 108.)

## F.  Trespass

Ocean's Eleven's seventh cause of action against Anders is for trespass.  Trespass is an unlawful interference with possession of property.  (*Girard v. Ball* (1981) 125 Cal.App.3d 772, 788.)  Ocean's Eleven's theory of trespass against Anders is that Anders sent three of his agents into Ocean's Eleven's casino, after he was banned, to distribute flyers to the customers that encourage them to visit his website.   However, Ocean's Eleven does not point to any portion of the record where we can find evidence supporting this theory.  Instead, it merely offers Kelegian's declaration wherein he states that he watched a videotape of three men distributing the subject flyers on Ocean's Eleven's property, and he does not recognize any of them as employees or customers of Ocean's Eleven.  Relying on this observation, Kelegian states:  "Based on these facts, I believe these men were agents of Mr. Anders."

We agree with Anders that this portion of Kelegian's declaration is not admissible evidence because it is based on information and belief of the declarant.  (See *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497 ["The problem with this averment is that information and belief, within the context of a special motion to strike a SLAPP suit, is inadequate to show 'a probability that the plaintiff will prevail on the claim.' "].)  Ocean's Eleven points to no other evidence to support its claim for trespass.  As such, Ocean's Eleven has not shown the probability that it will prevail on the merits of its cause of action for trespass.

G.  Preliminary and Permanent Injunction

Ocean's Eleven's final claim is for a preliminary and permanent injunction. "Injunctive relief is a remedy, not a cause of action."  (*City of South Pasadena v. Department of Transportation* (1994) 29 Cal.App.4th 1280, 1293.)  Thus, absent an underlying cause of action, a request for injunctive relief does not constitute a cause of action itself and cannot be the basis for relief.  Here, Ocean's Eleven has failed to show a probability of success on the merits of any of its first seven causes of action.  Therefore, there remains no cause of action on which to grant injunctive relief, and Ocean's Eleven has not shown a probability of success on the merits for its final cause of action.

## DISPOSITION

The order is reversed and remanded to the superior court with directions to enter an order granting Anders's special motion to strike and take further action consistent with this opinion, including but not limited to, awarding Anders his reasonable attorney fees under section 425.16, subdivision (c)(1).  Anders is awarded his costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.

41